# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 02-472V
### (To be published)

```
* * * * * * * * * * * * * * * * * * * * * * * * *
BRIAN HOOKER and                  *
MARCIE HOOKER,                    *
parents of SRH, a minor,          *          Filed: April 11, 2017
                                  *
             Petitioners,         *
                                  *
                                  *          Vaccine Act Fees and Costs;
        v.                        *          Autism Case; Reasonable Basis
                                  *
SECRETARY OF HEALTH AND           *
HUMAN SERVICES                    *
                                  *
             Respondent.          *
* * * * * * * * * * * * * * * * * * * * * * * * *
```

*Clifford Shoemaker, Shoemaker, Gentry & Knickelbein, Vienna, VA, for Petitioners.*
*Justine Walters, U.S. Department of Justice, Washington, DC, for Respondent.*

## DECISION AWARDING ATTORNEYS' FEES AND COSTS

**HASTINGS,** *Special Master*.

In this case under the National Vaccine Injury Compensation Program (hereinafter "the Program"[1]), in which Petitioners unsuccessfully contended that their child's autism spectrum disorder was vaccine-caused, Petitioners seek, pursuant to 42 U.S.C. § 300aa-15(e)(1), an award for attorneys' fees and other costs incurred in attempting to obtain Program compensation. After careful consideration, I have determined to grant the request in part, but to deny it in significant part, because it was not reasonable for Petitioners to continue to pursue their very weak case after August 31, 2011. Their claim is for a total of $210,039.67 in fees and costs, but I award only a total of $47,888.53.

---

[1]     The applicable statutory provisions defining the Program are found at 42 U.S.C. § 300aa-10 *et seq.* (2012 ed.). Hereinafter, for ease of citation, all "§" references will be to 42 U.S.C. (2012 ed.). The statutory provisions defining the Program are also sometimes referred to as the "Vaccine Act."

# I

## BACKGROUND LAW CONCERNING ATTORNEYS' FEES AND COSTS AWARDS

### A. General

Special masters have the authority to award "reasonable" attorneys' fees and litigation costs in Vaccine Act cases. §300aa–15(e)(1). This is true even when a petitioner is unsuccessful on the merits of the case, if the petition was filed in good faith and with a reasonable basis. *Id.* "The determination of the amount of reasonable attorneys' fees is within the special master's discretion." *Saxton v. HHS,* 3 F.3d 1517, 1520 (Fed. Cir. 1993); *see also Shaw v. HHS,* 609 F.3d 1372, 1377 (Fed. Cir. 2010).

Further, as to all aspects of a claim for attorneys' fees and costs, the burden is on the *petitioner* to demonstrate that the attorneys' fees claimed are "reasonable." *Sabella v. HHS,* 86 Fed. Cl. 201, 215 (2009); *Hensley v. Eckerhart,* 461 U.S. 424, 437 (1983); *Rupert v. HHS,* 52 Fed. Cl. 684, 686 (2002); *Wilcox v. HHS,* No. 90–991V, 1997 WL 101572, at *4 (Fed. Cl. Spec. Mstr. Feb. 14, 1997). The petitioner's burden of proof to demonstrate "reasonableness" applies equally to *costs* as well as attorneys' fees. *Perreira v. HHS,* 27 Fed. Cl. 29, 34 (1992), *aff'd,* 33 F.3d 1375 (Fed. Cir. 1994).

One test of the "reasonableness" of a fee or cost item is whether a hypothetical petitioner, who had to use his own resources to pay his attorney for Vaccine Act representation, would be willing to pay for such expenditure. *Riggins v. HHS,* No. 99–382V, 2009 WL 3319818, at *3 (Fed. Cl. Spec. Mstr. June 15, 2009), *aff'd by unpublished order* (Fed. Cl. Dec. 10, 2009), *aff'd,* 406 Fed. App'x. 479 (Fed. Cir. 2011); *Sabella v. HHS,* No. 02–1627V, 2008 WL 4426040, at *28 (Fed. Cl. Spec. Mstr. Aug. 29, 2008), *aff'd in part and rev'd in part,* 86 Fed. Cl. 201 (2009). In this regard, the United States Court of Appeals for the Federal Circuit has noted that:

> [i]n the private sector, 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's *client* also are not properly billed to one's *adversary* pursuant to statutory authority.

*Saxton*, 3 F.3d at 1521 (emphasis in original) (quoting *Hensley,* 461 U.S. at 433–34). Therefore, in assessing the number of hours reasonably expended by an attorney, the court must exclude those "hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission." *Hensley,* 461 U.S. at 434; *see also Riggins*, 2009 WL 3319818, at *4.

The Federal Circuit has also made clear that special masters may rely on their prior experience in making reasonable fee determinations, without conducting a line-by-line analysis of the fee bill, and are not required to rely on specific objections raised by respondent. *See Saxton*, 3 F.3d at 1521; *Sabella*, 86 Fed. Cl. 201, 209 (2009); *see also Wasson v. HHS,* 24 Cl. Ct. 482, 484, 486 (1991), *aff'd,* 988 F.2d 131 (Fed. Cir. 1993) (holding that, in determining a reasonable number of hours expended in any given case, a special master may rely on her experience with the Vaccine Act and its attorneys, without basing her decision on a line-by-line

examination of the fee application).  A unanimous Supreme Court has articulated a similar holding:

> We emphasize, as we have before, that the determination of fees "should not result in a second major litigation." The fee applicant (whether a plaintiff or a defendant) must, of course, submit appropriate documentation to meet "the burden of establishing entitlement to an award." But trial courts need not, and indeed should not, become green-eyeshade accountants. The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection. So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time. And appellate courts must give substantial deference to these determinations, in light of "the district court's superior understanding of the litigation." We can hardly think of a sphere of judicial decisionmaking in which appellate micromanagement has less to recommend it.

*Fox v. Vice*, 563 U.S. 826, 838 (2011) (internal citations omitted).

## B.  Reasonable basis

As noted above, even if a petitioner is unsuccessful in obtaining Vaccine Act compensation for an injury, a special master "may" award fees and costs. (§300aa–15(e)(1).)  Of course, as recently noted by Judge Campbell-Smith, the statutory use of the term "may" means that a special master can also, in his or her discretion, *decline* to award any attorneys' fees or costs to a petitioner whose case is unsuccessful on the merits, if the special master does not find that an award is deserved under all the circumstances. *Chuisano v. HHS*, 116 Fed. Cl. 276, 285-286 (2014).  In practice, special masters have generally awarded fees, or declined to do so, based upon whether there was a "reasonable basis" for the claim advanced by the petitioners.

The statute and legislative history afford no guidance as to the precise meaning of "reasonable basis," and the case law is relatively scant.  Judge Campbell-Smith has explained that not all claims should be found to have a reasonable basis, and that whether a reasonable basis exists is determined by the "totality of the circumstances."  *Chuisano v. HHS*, 116 Fed. Cl. at 285-86.  A special master has "discretion" in determining whether a reasonable basis existed. *Murphy v. HHS*, 30 Fed. Cl. 60, 61 (1993), *aff'd without opinion*, 48 F.3d 1236 (1995) (judge affirmed a denial of reasonable basis, noting that the determination concerning reasonable basis is reviewed under an "abuse of discretion" standard).  In other cases in which, as in *Murphy*, a judge affirmed a denial of reasonable basis, the court remarked that the special master's discretion is "wide" (*Perreira v. HHS*, 27 Fed. Cl. 29, 34 (1992)), and "very broad" (*Silva v. HHS*, 108 Fed. Cl. 401, 405 (2012)).   In fact, in *Silva*, the court remarked that it is "difficult to imagine a broader grant of authority and discretion."  108 Fed. Cl. at 405.

In a significant number of Vaccine Act cases, special masters have found that no reasonable basis existed either to file the case, or to prosecute it beyond a certain point.  In most of those instances, the petitioner either did not seek review, or the special master's finding concerning reasonable basis was upheld on review.  *See, e.g., Somosot v. HHS*, No. 13-710V, 2014 WL 6536059 (Fed. Cl. Spec. Mstr. Oct. 31, 2014), *aff'd*, 120 Fed. Cl. 716 (2015); *Chuisano v. HHS*, No. 07-452V, 2013 WL 6234660 (Fed. Cl. Spec. Mstr. Oct. 25, 2013), *aff'd*, 116 Fed. Cl. 276 (2014); *Cortez v. HHS*, No.  09-176V, 2014 WL 1604002 (Fed. Cl. Spec. Mstr.

Mar. 26, 2014); *Silva v. HHS*, No. 10-101V, 2012 WL 2890452 (Fed. Cl. Spec. Mstr. June 22, 2012), *aff'd*, 108 Fed. Cl. 401 (2012); *Browning v. HHS*, No. 07-453V, 2010 WL 4359237 (Fed. Cl. Spec. Mstr. Sept. 27, 2010); *Brown v. HHS*, No. 99-539V, 2005 WL 1026713 (Fed. Cl. Spec. Mstr. Mar. 11, 2005); *Smith v. HHS*, No. 91-057V, 1992 WL 210999 (Cl. Ct. Spec. Mstr. Aug. 13, 1992); *Livingston v HHS*, No. 12-268V, 2015 WL 4397705 (Fed. Cl. Spec. Mstr. June 26, 2015); *Rydzewski v. HHS*, No. 99-571V, 2008 WL 382930 (Fed. Cl. Spec. Mstr. Jan. 29, 2008); *McCabe v. HHS*, No. 91-1540V, 1993 WL 135860 (Fed. Cl. Spec. Mstr. Apr. 15, 1993); *Stevens v. HHS*, No. 90-221V, 1992 WL 159520 (Cl. Ct. Spec. Mstr. June 9, 1992), *aff'd*, 996 F.2d 1236 (Fed. Cir. 1993)(unpublished).

One important opinion of the United States Court of Appeals for the Federal Circuit, discussing the "reasonable basis" requirement in a Vaccine Act case, is *Perreira v. HHS*, 33 F. 3d 1375 (Fed. Cir. 1994). In *Perreira*, the special master concluded that the petitioners had a reasonable basis for *initially filing* the petition and for the first part of their prosecution of the case, but concluded that there was *no reasonable basis* for pursuing the case beyond the point when the Perreiras submitted an expert report, at which time the Perreiras' attorneys should have realized that their expert's theory was plainly deficient to demonstrate causation. 33 F.3d at 1376. The special master denied fees and costs for work performed after that point, in taking the case to an evidentiary hearing. *Id*. Both the Court of Federal Claims (27 Fed. Cl. 29 (1992)), and the Federal Circuit (33 F.3d at 1376-77) affirmed.

The Court of Federal Claims judge rejected the Perreiras' argument that they automatically passed the "reasonable basis" test because they were relying on an expert's report, finding that argument to be "unreasonable." 27 Fed. Cl. at 33-34. The judge found that under all the circumstances of the case, for the petitioners to take the case to an evidentiary hearing "with no support in the contemporaneous medical records," and with no "*reputable* medical opinion or scientific studies" (emphasis added) was "unreasonable." *Id*. at 34.

The Federal Circuit agreed with the court below, observing that "counsel's duty to zealously represent their client does not relieve them of their duty to the court to avoid frivolous litigation." 33 F.3d at 1377. The appellate court added that Congress did not intend that every claimant qualify for an attorneys' fee award "by merely having an expert state an unsupported opinion that the vaccine was the cause in-fact of the injury." *Id*. The court concluded that the special master did not err in determining that the Perreiras "no longer had a reasonable basis for claiming causation in-fact" after their expert report was filed. *Id*.[2]

---

[2]     As to the issue of "reasonable basis" in *autism cases*, in a number of such cases in recent years, special masters have concluded that there was no reasonable basis to file the case, or to pursue it beyond a certain point when the case obviously was no longer viable. See the specific discussion of those autism cases at Section II(B) of this Decision, below.

# II

## BACKGROUND: THE OMNIBUS AUTISM PROCEEDING ("OAP")

### A.  *The OAP in general*

This case is one of more than 5,400 cases filed under the Program in which petitioners alleged that conditions known as "autism" or "autism spectrum disorders" ("ASD")[3] were caused by one or more vaccinations.  A special proceeding known as the Omnibus Autism Proceeding ("OAP") was developed to manage these cases within the Office of Special Masters ("OSM").  A detailed history of the controversy regarding vaccines and autism, along with a history of the development of the OAP, was set forth in the six entitlement decisions issued as "test cases" for two theories of causation litigated in the OAP (see cases cited below), and will only be summarized here.

A group called the Petitioners' Steering Committee ("PSC") was formed in 2002 by the many attorneys who represented Vaccine Act petitioners who raised autism-related claims.  About 180 attorneys participated in the PSC.  Their responsibility was to develop any available evidence indicating that vaccines could contribute to causing autism, and eventually present that evidence in a series of "test cases," exploring the issue of whether vaccines could cause autism, and, if so, in what circumstances.  Ultimately, the PSC selected groups of attorneys to present evidence in two different sets of "test cases" during many weeks of trial in 2007 and 2008.  In the six test cases, the PSC presented two separate theories concerning the causation of ASDs.  The first theory alleged that the *measles* portion of the measles, mumps, rubella ("MMR") vaccine could cause ASDs.  That theory was presented in three separate Program test cases during several weeks of trial in 2007.  The second theory alleged that the mercury contained in *thimerosal-containing vaccines* could directly affect an infant's brain, thereby substantially contributing to the causation of ASD.  That theory was presented in three additional test cases during several weeks of trial in 2008.

Decisions in each of the three test cases pertaining to the PSC's *first* theory rejected the petitioners' causation theories.  *Cedillo v. HHS*, No. 98-916V, 2009 WL 331968 (Fed. Cl. Spec.

---

[3]  "Autism Spectrum Disorder" is a *general* classification which as of 2010 included five different specific disorders: Autistic Disorder, Childhood Disintegrative Disorder, Asperger's Syndrome, Rett Syndrome, and Pervasive Developmental Disorder Not Otherwise Specified (PDD-NOS).  *King v. HHS*, No. 03-584V, 2009 WL 892296 at *5 (Fed. Cl. Spec. Mstr. Feb. 12, 2010).  The term "autism" is often utilized to encompass *all* of the types of disorders falling within the autism spectrum.  (*Id.*)  I recognize that since the OAP test cases, the consensus description of ASDs, contained now in the "DSM-V" as opposed to the prior "DSM-IV," revises the prior subcategories of ASD set forth in the first sentence of this footnote.  However, the DSM-V retains the same *general description* of ASDs.  An ASD is a serious form of neurodevelopmental disorder defined by a collection of symptoms and behaviors, including significant impairment of social interaction and language skills, and the presence of repetitive, stereotyped interests.  *E.g.*, *Snyder v. HHS*, No. 01-162V, 2009 WL 332044, at *31 (Fed. Cl. Spec. Mstr. Feb. 12, 2009).

Mstr. Feb. 12, 2009) *aff'd*, 89 Fed. Cl. 158 (2009), *aff'd*, 617 F.3d 1328 (Fed. Cir. 2010); *Hazlehurst v. HHS*, No. 03-654V, 2009 WL 332306 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), *aff'd* 88 Fed. Cl. 473 (2009), *aff'd*, 604 F.3d 1343 (Fed. Cir. 2010); *Snyder v. HHS*, No. 01-162V, 2009 WL 332044 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), *aff'd*, 88 Fed. Cl. 706 (2009).[4]  Decisions in each of the three "test cases" pertaining to the PSC's *second* theory also rejected the petitioners' causation theories, and the petitioners in each of those three cases chose not to appeal.  *Dwyer v. HHS*, No. 03-1202V, 2010 WL 892250 (Fed. Cl. Spec. Mstr. Mar. 12, 2010); *King v. HHS*, No. 03-584V, 2010 WL 892296 (Fed. Cl. Spec. Mstr. Mar 12, 2010); *Mead v. HHS*, No. 03-215V, 2010 WL 892248 (Fed. Cl. Spec. Mstr. Mar. 12, 2010).

The "test case" decisions were comprehensive, analyzing in detail all of the evidence presented on both sides.  The three test case decisions concerning the PSC's *first* theory (concerning the MMR vaccine) totaled more than 600 pages of detailed analysis, and were solidly affirmed in many more pages of analysis in three different rulings by three different judges of the United States Court of Federal Claims, and in two rulings by two separate panels of the United States Court of Appeals for the Federal Circuit.  The three special master decisions concerning the PSC's *second* theory (concerning vaccinations containing the preservative "thimerosal") were similarly comprehensive.

All told, the 11 lengthy written rulings by the special masters, the judges of the U.S. Court of Federal Claims, and the panels of the U.S. Court of Appeals for the Federal Circuit *unanimously rejected* the petitioners' claims, finding no persuasive evidence that either the MMR vaccine or thimerosal-containing vaccines could contribute in any way to the causation of autism.

Thus, the proceedings in the six "test cases" concluded in 2010.  Thereafter, the Petitioners in this case, and the petitioners in other cases within the OAP, were instructed to decide how to proceed with their own claims.  The vast majority of those autism petitioners elected either to withdraw their claims or, more commonly, to request that the special master file a decision denying their claim on the written record, resulting in a decision rejecting the petitioner's claim for lack of support.  However, a small minority of the autism petitioners have elected to continue to pursue their cases, seeking other causation theories and/or other expert witnesses.  A few such cases have gone to trial before a special master, and in the cases of this type decided thus far, all have resulted in *rejection* of petitioners' claims that vaccines played a role in causing their child's autism.  *See, e.g.*, *Henderson v. HHS*, No. 09-616V, 2012 WL 5194060 (Fed. Cl. Spec. Mstr. Vowell Sept. 28, 2012) (autism not caused by pneumococcal vaccination); *Blake v. HHS*, No. 03-31V, 2014 WL 2769979 (Fed. Cl. Spec. Mstr. Vowell May 21, 2014) (autism not caused by MMR vaccination); *Murphy v. HHS*, No. 05-1063V, 2016 WL 3034047 (Fed. Cl. Spec. Mstr. Corcoran Apr. 25, 2016) (autism not caused by DTaP or MMR vaccines), *aff'd*, 2016 WL 4926207 (Fed. Cl. Aug. 15, 2016); *Franklin v. HHS*, No. 99-855V, 2013 WL 3755954 (Fed. Cl. Spec. Mstr. Hastings May 16, 2013) (MMR and other vaccines found not to contribute to autism); *Coombs v. HHS*, No. 08-818V, 2014 WL 1677584 (Fed. Cl. Spec. Mstr. Hastings Apr. 8, 2014) (autism not caused by MMR or Varivax vaccines); *Long v. HHS*, No. 08-792V, 2015 WL 1011740 (Fed. Cl. Spec. Mstr. Hastings Feb. 19, 2015) (autism not caused by influenza vaccine); *Brook v. HHS*, No. 04-405V, 2015 WL 3799646

---

[4]	The petitioners in *Snyder* did not appeal the decision of the U.S. Court of Federal Claims.

(Fed. Cl. Spec. Mstr. Hastings May 14, 2015) (autism not caused by MMR or Varivax vaccines); *Holt v. HHS*, No. 05-136V, 2015 WL 4381588 (Fed. Cl. Spec. Mstr. Vowell June 24, 2015) (autism not caused by hepatitis B vaccine) (on review); *Lehner v. HHS*, No. 08-554V, 2015 WL 5443461 (Fed. Cl. Spec. Mstr. Vowell July 22, 2015) (autism not caused by influenza vaccine); *Miller v. HHS*, No. 02-235V, 2015 WL 5456093 (Fed. Cl. Spec. Mstr. Vowell August 18, 2015) (ASD not caused by combination of vaccines); *Allen v HHS*, No. 02-1237V, 2015 WL 6160215 (Fed. Cl. Spec. Mstr. Vowell Sept. 26, 2015) (autism not caused by MMR vaccination); *R.K. v. HHS*, No. 03-632V, 2015 WL 10936124 (Fed. Cl. Spec. Mstr. Vowell Sept. 28, 2015) (autism not caused by influenza vaccine), *aff'd*, 125 Fed. Cl. 57 (2016), *aff'd*, 2016 WL 7174139 (Fed. Cir. Dec. 9, 2016); *Hardy v. HHS*, No. 08-108V, 2015 WL 7732603 (Fed. Cl. Spec. Mstr. Hastings Nov. 3, 2015) (autism not caused by several vaccines); *Sturdivant v. HHS*, No. 07-788V, 2016 WL 552529 (Fed. Cl. Spec. Mstr. Hastings Jan. 21, 2016) (autism not caused by Hib and Prevnar vaccines); *R.V. v. HHS,* No. 08-504V, 2016 WL 3882519 (Fed. Cl. Spec. Mstr. Corcoran Feb. 19, 2016) (autism not caused by influenza vaccine), *aff'd*, 2016 WL 3647786 (Fed. Cl. June 2, 2016); *Cunningham v. HHS*, No. 13-483V, 2016 WL 4529530 (Fed. Cl. Spec. Mstr. Hastings Aug. 1, 2016) (autism not caused by MMR vaccine), *aff'd*, 2017 WL 1174448 (Fed. Cl. Jan. 25, 2017); *T.M. v. HHS*, No. 08-284V (Fed. Cl. Spec. Mstr. Corcoran Aug. 9, 2016) (not yet published) (autism not caused by DTaP vaccine) (on review); *Anderson v. HHS*, No. 02-1314V, 2016 WL 8256278 (Fed. Cl. Spec. Mstr. Corcoran Nov. 1, 2016) (autism not caused by MMR vaccination) (on review); *Dempsey v. HHS*, No. 04-394V, 2017 WL 10548480 (Fed. Cl. Spec. Mstr. Hastings Feb. 23, 2017).

In addition, some autism causation claims have been rejected *without trial*, at times over the petitioner's objection, in light of the failure of the petitioner to file plausible proof of vaccine-causation. *See, e.g., Waddell v. HHS*, No. 10-316V, 2012 WL 4829291 (Fed. Cl. Spec. Mstr. Campbell-Smith Sept. 19, 2012) (autism not caused by MMR vaccination); *Fester v. HHS*, No. 10-243V, 2016 WL 1745436 (Fed. Cl. Spec. Mstr. Dorsey April 7, 2016) (autism not caused by measles, mumps, rubella, and varicella (MMRV) vaccine); *Fresco v. HHS*, No. 06-469V, 2013 WL 364723 (Fed. Cl. Spec. Mstr. Vowell Jan. 7, 2013) (autism not caused by multiple vaccines); *Fesanco v. HHS*, No. 02-1770, 2010 WL 4955721 (Fed. Cl. Spec. Mstr. Hastings Nov. 9, 2010) (autism not caused by multiple vaccines); *Miller v. HHS*, No. 06-753V, 2012 WL 12507077 (Fed. Cl. Spec. Mstr. Hastings Sept. 25, 2012) (autism not caused by DTaP or MMR vaccines); *Pietrucha v. HHS*, No. 00-269V, 2014 WL 4538058 (Fed. Cl. Spec. Mstr. Hastings Aug. 22, 2014) (autism not caused by multiple vaccines); *Bushnell v. HHS*, No. 02-1648, 2015 WL 4099824 (Fed. Cl. Spec. Mstr. Hastings June 12, 2015) (autism not caused by multiple vaccines); *Bokmuller v. HHS*, No. 08-573, 2015 WL 4467162 (Fed. Cl. Spec. Mstr. Hastings June 26, 2015) (autism not caused by multiple vaccines); *Canuto v. HHS*, No. 04-1128, 2015 WL 9854939 (Fed. Cl. Spec. Mstr. Hastings Dec. 18, 2015) (autism not caused by DTP and DTaP vaccines); *Valle v. HHS*, No. 02-220V, 2016 WL 2604782 (Fed. Cl. Spec. Mstr. Hastings April 13, 2016) (autism not caused by DTaP vaccine); *Hooker v. HHS*, 02-472V, 2016 WL 3456435 (Fed. Cl. Spec. Mstr. Hastings May 19, 2016) (autism not caused by multiple vaccines).  Judges of this court have affirmed the practice of dismissal without trial in such cases. *E.g.*, *Fesanco v. HHS*, 99 Fed. Cl. 28 (2011) (Judge Braden affirming); *Canuto v. HHS*, No. 04-1128V, 2016 WL 2586510 (Fed. Cl. Apr. 18, 2016) (Judge Yock affirming), *aff'd*, 2016 WL 5746370 (Fed. Cir. Oct. 4, 2016).

In none of the rulings since the test cases has a special master or judge found any merit in an allegation that any vaccine can contribute to causing autism.[5]

### B.  Fee requests and "reasonable basis" in autism-related claims

In the OAP "test cases" decisions set forth above, the special masters found that the cases had been filed and prosecuted with a reasonable basis, and very large amounts were awarded for attorneys' fees and expert costs. *E.g.*, *Cedillo v. HHS*, No. 98-916V, 2008 WL 5329951 (Fed. Cl. Spec. Mstr. Nov. 18, 2008); *Cedillo v. HHS*, No. 98-916V, 2009 WL 811449 (Fed. Cl. Spec. Mstr. Mar. 11, 2009); *Cedillo v. HHS*, No. 98-916V, 2009 WL 1726228 (Fed. Cl. Spec. Mstr. May 21, 2009); *Cedillo v. HHS*, No. 98-916V (Fed. Cl. Spec. Mstr. Mar. 16, 2010)(on Court website);  *Cedillo v. HHS*, No. 98-916V, 2010 WL 4853342 (Fed. Cl. Spec. Mstr. Nov. 08, 2010); *Cedillo v. HHS*, No. 98-916V (Fed. Cl. Spec. Mstr. Nov. 29, 2010) (on Court website);

---

[5]     I am well aware, of course, that during the years since the "test cases" were decided, in two cases involving vaccinees suffering from ASDs, Vaccine Act compensation was granted. But in *neither* of those cases did the Respondent concede, nor did a special master find, that there was any *"causation-in-fact"* connection between a vaccination and the vaccinee's ASD.  Instead, in both cases it was conceded or found that the vaccinee displayed the symptoms of a *Table Injury* within the Table time frame after vaccination.

In *Poling v.* HHS, the presiding special master clarified that the family was compensated because the Respondent conceded that the Poling child had suffered a *Table Injury--not* because the Respondent or the special master had concluded that any vaccination had contributed to causing or aggravating the child's ASD.  *See Poling v.* HHS, No. 02-1466V, 2011 WL 678559, at *1 (Fed. Cir Spec. Mstr. Jan. 28, 2011) (a fees decision, but noting specifically that the case was compensated as a Table Injury).

Second, in *Wright v. HHS*, No. 12-423, 2015 WL 6665600 (Fed. Cl. Spec. Mstr. Sept. 21, 2015), Special Master Vowell concluded that a child, later diagnosed with ASD, suffered a "Table Injury" after a vaccination.  However, she stressed that she was *not*  finding that the vaccinee's ASD in that case was "caused-in-fact" by the vaccination--to the contrary, she specifically found that the evidence in that case did *not* support a "causation-in-fact" claim, going so far as to remark that the petitioners' "causation-in-fact" theory in that case was "absurd."  *Wright v. HHS*, No. 12-423, 2015 WL 6665600, at *2 (Fed. Cl. Spec. Mstr. Sept. 21, 2015).

The compensation of these two cases, thus does *not* afford any support to the notion that vaccinations can contribute to the *causation* of autism.  In setting up the Vaccine Act compensation system, Congress forthrightly acknowledged that the Table Injury presumptions would result in compensation for some injuries that were *not*, in fact, truly vaccine-caused.  H.R. Rept. No. 99-908, 18, 1986 U.S.C.C.A.N. 6344, 6359.  ("The Committee recognizes that there is public debate over the incidence of illnesses that coincidentally occur within a short time of vaccination.  The Committee further recognizes that the deeming of a vaccine-relatedness adopted here may provide compensation to some children whose illness is not, in fact, vaccine-related.")

*Cedillo v. HHS*, No. 98-916V, 2011 WL 1628009 (Fed. Cl. Spec. Mstr. Apr. 06, 2011); *King v. HHS*, No. 03-584V, 2009 WL 2252534 (Fed. Cl. Spec. Mstr. July 10, 2009); *King v. HHS*, No. 03-584V, 2009 WL 2524564 (Fed. Cl. Spec. Mstr. July 27, 2009); *King v. HHS*, No. 03-584V, 2009 WL 3320508 (Fed. Cl. Spec. Mstr. Sept. 28, 2009); *King v. HHS*, No. 03-584V, 2010 WL 5644667 (Fed. Cl. Spec. Mstr. Jan. 07, 2010); *King v. HHS*, No. 03-584V, 2010 WL 5470787 (Fed. Cl. Spec. Mstr. Dec. 13, 2010); *King v. HHS*, No. 03-584V, 2011 WL 5926126 (Fed. Cl. Spec. Mstr. Sept. 22, 2011); *King v. HHS*, No. 03-584V (Fed. Cl. Spec. Mstr. July 10, 2012) (on Court website).

After the "test cases," as explained above, a number of additional petitioners have attempted to demonstrate in Vaccine Act cases that persons diagnosed with autism had suffered vaccine-caused injuries, and those attempts have been virtually always been unsuccessful. (See discussion and case citations at pp. 5-7, above.)  In most of the first few of those cases, Respondent did not challenge whether there was a "reasonable basis" to file such cases or to pursue them to a decision, and the special masters awarded compensation for the fees and costs of pursuing the Vaccine Act case.

However, as more and more such cases were prosecuted, Respondent and various special masters began to question whether there was a reasonable basis to file such cases, or to pursue them to a ruling by a special master.  For example, in one autism case, Special Master Campbell-Smith,[6] in a ruling filed on March 22, 2012, evaluated the petitioners' case, and concluded that "there does not seem to be a reasonable basis for moving forward with this claim." *Edmonds v. HHS*, No. 04-87V, 2012 WL 1229149, at *8, fn. 22 (Fed. Cl. Spec. Mstr. March 22, 2012).  In another autism case, in an order filed on March 2, 2012, Special Master Campbell-Smith evaluated the petitioners' case, including the petitioners' expert report, and concluded that "the reasonableness of moving forward [with the case] is in question." *See Hardy v. HHS*, No. 08-108V, 2016 WL 4729530, at *7 (Fed. Cl. Spec. Mstr. Aug. 16, 2016).

Similarly, in another autism case, Special Master Vowell, after hearing the petitioners' causation claim in full, thoroughly rejected that claim in an emphatic opinion strongly suggesting that she doubted the reasonableness of pursuing the claim to a decision. *Miller v. HHS*, 02-235V, 2015 WL 5456093 (Fed. Cl. Spec. Mstr. Aug. 18, 2015).  She specifically remarked that one aspect of petitioners' claim was "unreasonable." (*Id.* at *37)

I myself have, in a number of cases, also addressed the issue of whether a reasonable basis existed for a petitioners' counsel to go forward with a very weak causation argument in an autism case, in light of the test cases and the many subsequently denied cases set forth in Section II(B), above.  In several cases, I have, in the course of denying an autism-related causation claim, included statements warning Vaccine Act attorneys that advancing similar theories, or certain experts, might not be considered reasonable in autism cases. *See, e.g.*, *Long v. HHS*, No. 08-792V, 2015 WL 11011740, at *19-20 (Fed. Cl. Spec. Mstr. Feb. 9, 2015); *Hardy v. HHS*, No. 08-108V, 2015 WL 7732603, at *33-35 (Fed. Cl. Spec. Mstr. Nov. 3, 2015); *Sturdivant v. HHS*, No. 07-788V, 2016 WL 552529, at *19-20 (Fed. Cl. Spec. Mstr. Jan. 21, 2016).

Further, in several attorneys' fees decisions in autism cases filed in 2016, I have found that while it was reasonable to *initially file* the case, there was no reasonable basis to *keep*

---

[6]        Former Special Master Campbell-Smith is now a Judge of this Court.

*litigating* the case after a certain point in time. *See Miller v. HHS*, No. 02-235V, 2016 WL 3746160 (Fed. Cl. Spec. Mstr. June 3, 2016)[7] ($63,669 requested; $4,546 granted); *Hardy v. HHS*, No. 08-108V, 2016 WL 4729530 (Fed. Cl. Spec. Mstr. Aug. 6, 2016) ($41,552 requested; $7,619 granted); *Hashi v. HHS*, No. 08-307V, 2016 WL 5092917 (Fed. Cl. Spec. Mstr. Aug. 25, 2016); *Hashi v. HHS*, No. 08-308V, 2016 WL 5093039 (Fed. Cl. Spec. Mstr. Aug. 25, 2016).[8]

I note also that, in a number of recent Vaccine Act cases involving autism, Chief Special Master Dorsey, Special Master Corcoran, or the undersigned special master have notified petitioners, sometime after the filing of a petition, that the special master saw no "reasonable basis" for the petition to go forward.[9]   In one case, Chief Special Master Dorsey wrote that "[i]n the absence of further medical and/or scientific developments, the undersigned is unlikely to be persuaded of vaccine causation in future claims that vaccinations caused an autism spectrum disorder.  She will be disinclined to find a reasonable basis to compensate the attorneys, law students, and/or experts involved in such cases." *Wilson v. HHS*, No. 15-551V, 2017 WL 877278, at *6, fn. 14 (Fed. Cl. Spec. Mstr. Feb. 10, 2017).

# III

## PROCEDURAL HISTORY OF THIS CASE[10]

### A.  *Initial proceedings*

Petitioners filed a "Petition for Vaccine Compensation" on behalf of their son SRH on May 10, 2002. (ECF No. 1.)  The Petition alleged that as the direct result of MMR and Varivax vaccinations that SRH received on February 25, 1999; the Hib vaccination he received on May 26, 1999; "and all the thimerosal containing vaccines" that he had received, SRH "developed Autism." (Petition, ¶¶ 7-8.)

---

[7]	This is the same *Miller* case in which Special Master Vowell ruled on the *merits* of the petitioners' causation claim, cited above at p.7 of this Decision.  After Special Master Vowell retired from the OSM, I was assigned the case, and ruled upon the request for attorneys' fees.

[8]	I note also that in another autism case, Special Master Corcoran, while not finding that a reasonable basis for pursuing the case ended at any particular point in time, did find that the number of hours requested for litigating the latter stages of the case was greatly excessive, in light of the cases cited above in this opinion in which autism claims have virtually always been denied. *R.V. v. HHS,* No. 08-504V, 2016 WL 7575568 (Fed. Cl. Nov. 28, 2016), at *4.  The special master reduced a claim for more than $85,000 in fees and costs to $45,889.70. (*Id.* at *5.)

[9]	These notifications were delivered orally and/or in written procedural orders that have not been published or posted on this Court's website, and thus I have no published document to cite in these cases, but I am aware that a number of such orders have been issued by each of the two other special masters as well as by myself.

[10]	A more detailed procedural history of this case was presented in my Decision denying compensation in this case. *See* 2016 WL 3456435, at *6-9.

On May 22, 2002, this case, along with many others, was stayed indefinitely pending completion of the general inquiry under the Omnibus Autism Proceeding regarding the possible causal relationship between certain vaccines and autistic spectrum disorders. (ECF No. 3.) (*See* Section II of this Decision above.)

This case was assigned to my docket on July 29, 2002. (ECF No. 6.)

### B. The (first) Amended Petition

Following the resolution of the autism "test cases" (see Section II above), Petitioners filed an Amended Petition ("Am. Pet.") on July 20, 2011, alleging that SRH developed "mercury poisoning" as a result of the MMR vaccination he received on February 25, 1999, and his fourth Hib vaccination, received on May 26, 1999. (Am. Pet., ECF No 22, ¶¶ 7, 8, 15, 18.) (Although it is noteworthy that one of those two vaccinations, the MMR, in fact did *not contain* any mercury.)

After reviewing that Amended Petition, I conducted a telephonic status conference on August 2, 2011.  (*See* ECF No. 24.)  During the conference, I *specifically warned* Petitioners' counsel that if Petitioners continued to pursue their "mercury poisoning" causation claim, which was no different from the theory pursued in the *King*, *Mead*, and *Dwyer* OAP "test cases" described above, then it would be questionable whether I would find Petitioners' efforts beyond that date to be reasonable, for purposes of obtaining attorneys' fees and costs. (*Id*.)  I reiterated that warning in a follow-up Order issued on August 15, 2011. (*Id*.)

In that Order issued on August 15, 2011, I also notified Petitioners that if they wished to go forward with their case, they would need to file an expert report in support of their claim, and they must do so within 90 days. (ECF No. 24.)  Over the course of the next fifteen months, Petitioners filed a series of seven status reports describing their efforts to contact potential experts who might be willing to opine about their claim. (ECF Nos. 25-31.)

 On December 6, 2012, I filed an Order noting that fifteen months had passed, but Petitioners had not yet filed an expert report. (ECF No. 32.)  That Order warned Petitioners that if they failed to file an expert report within six months, their petition would be dismissed for failure to prove the case. (*Id*.)

### C. Initial expert report of Dr. Mark Geier

Over the following six months, Petitioners filed three more status reports regarding their attempts to obtain the opinion of a medical expert. (ECF Nos. 33-35.)  Then, on June 6, 2013, Petitioners filed the report of Dr. Mark Geier. (*See* Ex. 17, ECF No. 36-2.)  A digitally-recorded status conference was convened, on June 20, 2013, at the request of Respondent, to discuss Dr. Geier's report. (Order, filed June 27, 2013, ECF No. 39.)  During that conference, Respondent noted that: 1) Dr. Geier's report was written in 2007, before the conclusion of the OAP test

cases;[11] 2) Dr. Geier's report expounded theories that were rejected in the OAP test cases; and 3) Dr. Geier's medical license had been revoked. (*Id*.)

On August 20, 2013, Respondent filed a Motion to Dismiss this case, alleging that Dr. Mark Geier lacked appropriate qualifications to opine on this matter. (ECF No. 40, pp. 7-8.) Thereafter, Respondent filed Exhibits A and B, consisting of copies of official documents of the Maryland State Board of Physicians, which first suspended, then revoked the medical license of Dr. Mark Geier, effective as of August 22, 2012. (ECF No. 41, filed Sep. 4, 2013.)

### D. Petitioners' additional expert reports

Petitioners on October 4, 2013, filed a response to Respondent's Motion to Dismiss. (ECF No. 43.)  Petitioners on October 4, 2013, also filed Ex. 19. (ECF No. 44.)  Ex. 19 included a 69-page declaration of Brian Hooker, one of the Petitioners in this case, who is not a medical doctor but has a Ph.D. in chemical engineering.  That filing elaborates Dr. Hooker's criticisms of evidence presented by Respondent during the OAP "test case" litigation, his defense of the qualifications of Dr. Geier, and various assertions of improper conduct by Respondent.  The balance of Ex. 19 consisted of various materials that Dr. Hooker cited in his critique.

Also on October 4, 2013, Petitioners filed five expert reports. (ECF Nos. 45, 46.)  These reports included: Ex. 21, the report of David Geier; Ex. 23, the supplemental report of Dr. Mark Geier; Ex. 25, the report of Janet Kern, Ph.D.; Ex. 27, the report of Boyd Haley, Ph.D.; and Ex. 29, the report of Stephen Smith, M.D. (*Id*.)  On October 8, 2013, Petitioners filed Ex. 30, a revised version of Dr. Kern's previous expert report. (ECF No. 49.)

A status conference convened on November 15, 2013, during which I denied Respondent's Motion to Dismiss. (Order, ECF No. 52, filed Nov. 20, 2013.)  At that conference, the parties also discussed the possible filing by Petitioners of another expert report, to be prepared by Dr. Frances Kendall.  Petitioners were allowed additional time to file that report. (*Id*.)  Petitioners subsequently filed a series of motions, each requesting additional time to file such report, and those motions were granted. (*See* ECF Nos. 53, 55, 56, 57.)  However, on the ultimate due date for Dr. Kendall's report, Petitioners instead filed the expert report of Mary Megson, M.D. (*See* Ex. 32, ECF No. 58-2, filed April 18, 2014.)  Respondent was allowed 60 days to file responsive expert reports. (ECF No. 59.)

On April 22, 2014, Respondent moved to amend the procedural schedule, in order to postpone the filing of Respondent's "Rule 4 report" and expert report, until Petitioners submitted multiple medical records. (ECF No. 60.)  Accordingly, I amended the schedule. (ECF No. 61.) Petitioners filed medical records and medical literature on various dates thereafter.

---

[11]     Petitioners' Ex. 17, signed by Dr. Geier, was dated Nov. 11, 2007; that is, about 5½ years before it was filed, on June 6, 2013. (*See* Ex. 17, p. 11.)

### E. Respondent's Report and (second) Motion to Dismiss

On January 22, 2015, Respondent filed the reports of three medical experts,[12] along with medical literature. (ECF No. 83.)  On that same date, Respondent filed a second Motion to Dismiss, and Respondent's "Rule 4 report,"[13] stating Respondent's position that Petitioners' claim should be denied. (ECF No. 82.)

The Motion to Dismiss was based on Respondent's defense that the original Petition in the case was untimely filed. (*See* ECF No. 82, pp. 18-21.)  Respondent argued that the first symptoms of SRH's autism appeared prior to May 10, 1999, which date was three years before the filing date of this petition. (*Id.*)  Thus, Respondent contended that Petitioners failed to comply with the Vaccine Act's statute of limitations, which requires that a petition must be filed within 36 months of the date when the symptoms of an alleged vaccine-related injury first occurred.[14] (*Id.*)

### F. Petitioners' Second Amended Petition

On March 9, 2015, Petitioners filed a Second Amended Petition ("2nd Am. Pet."), which *again* alleged that SRH developed "mercury poisoning" as the direct result of the MMR vaccination that he received on February 25, 1999, and the Hib vaccination he received on May 26, 1999. (2nd Am. Pet., ¶¶ 7, 8, 16, 20.)  Petitioners once again alleged that they first noticed symptoms of SRH's condition "following the May 1999 vaccination." (*Id.*, ¶ 9.)

This Second Amended Petition, however, added an alternative pleading that "the vaccinations that [SRH] received within the three years prior to filing the Petition significantly aggravated his autism." (2nd Am. Pet., ¶18.)  They followed that with a document filed on March 23, 2015, which stated that the vaccinations which allegedly caused the "significant aggravation" were "the vaccinations that he received on May 26, 1999." (ECF No. 95, p. 18.)

On March 17, 2015, a status conference was held, to address the "significant modifications of petitioners' theory of this case," namely their addition of the alternative

---

[12]     *See* Ex. C, the report of Bennett Leventhal, M.D.; Ex. F, the report of Edward Cetaruk, M.D.; and Ex. H, the report of Gerald Raymond, M.D.

[13]     That report was labelled as a "supplemental" report, but was actually the only "Rule 4 report" that Respondent filed in this case.

[14]     A document titled "Respondent's Response to Petitioners' Allegations of Misconduct and Motion to Strike" was also filed on January 22, 2015. (ECF No. 81.)  This filing presented arguments that various paragraphs within Petitioners' Exhibit 19, the affidavit of Brian Hooker, should be stricken from the record because they contain, *inter alia*, baseless accusations that attorneys of the U.S. Department of Justice committed misconduct. (*Id.*)  Although I found no reason to conclude that any of Respondent's attorneys had committed misconduct, I did not strike any of Ex. 19 from the record, which is unavailable to the public in any event.

"significant aggravation" theory. (Order, filed March 18, 2015, ECF No. 92.)  As a result of that discussion, Petitioners were instructed to file "supplemental expert reports from any of petitioners' experts who will participate in the trial of this case, explaining why they support the theory stated in the [Second] Amended Petition." (*Id*.)

Petitioners asked for an enlargement of time to provide the medical records requested in my Order, dated March 18, 2015. (ECF No. 103, filed May 1, 2015.)  I granted Petitioners' Motion, but included a specific reminder that "their expert reports are still due on May 18, 2015." (Order, filed May 1, 2015, ECF No. 104.)

### G.  Filings in May of 2015

On May 18, 2015, Petitioners filed a Status Report. (ECF No. 107.)  That status report stated:

> Petitioner [sic] has discussed the reports filed by all the experts in this case with the experts for the Petitioner, and *Petitioner does not feel that any further supplemental reports are necessary*.  Petitioner is ready to schedule this case for a hearing.

> Both Dr. Smith and Dr. Megson have indicated that the vaccines administered on May 26, 1999 (DTaP, OPV, and Hib) triggered the onset of SRH's encephalopathy resulting in autism.  If the court determines that there were earlier symptoms of "autism", something which Petitioners absolutely do not agree with, then it is clear from the medical records that his condition dramatically changed for the worse after the May 26, 1999 vaccinations, and the opinions of Drs. Megson and Smith would be that this dramatic change was triggered, as they have stated, by these 15 month vaccinations.

(ECF No. 107) (emphasis added.)

Accordingly, on May 20, 2015, I filed an Order commenting on Petitioners' failure to provide supplemental expert reports in support of the new theory presented in Petitioners' Second Amended Petition. (ECF No. 109.)  I noted that, contrary to my specific direction, Petitioners had expressly declined to file any supplemental expert reports to support their new alternative theory of significant aggravation, preferring instead to rely on the previously submitted expert reports of Dr. Smith and Dr. Megson. (*Id*.)  Considering these factors, I determined that the appropriate procedure to resolve this case would be to rule on the existing written record, without an evidentiary hearing, pursuant to Vaccine Rule 8(d). (*Id*.)

Petitioners did not object to the procedure outlined in my Order filed on May 20, 2015, or even comment on it.  Petitioners never filed any written request for an evidentiary hearing.

### H.  My Decision

On May 19, 2016, I filed a Decision denying Petitioners' claim for Program compensation. *Hooker v. HHS*, No. 02-472V, 2016 WL 3456435 (Fed. Cl. Spec. Mstr. May 19, 2016).  Petitioners did not seek review of that Decision, and judgment entered on June 27, 2016. (ECF No. 121.)

### I.  Petitioners' application for fees and costs

On June 7, 2016, Petitioners filed an application seeking attorneys' fees and costs incurred in their attempt to gain compensation in this proceeding. (ECF No. 117.)  They initially sought a total of $199,652.67 in fees and costs. (*Id.*)  Respondent filed a Response on August 8, 2016, arguing, among other things, that Petitioners had no reasonable basis for continuing forward with their Petition after mid-2011, which was a few months after the "test cases" filed in the OAP became final. (ECF No. 125, pp. 11-16.)  Petitioners filed a reply brief on October 19, 2016. (ECF No. 129.)  In that reply brief, they sought additional attorneys' fees for their law firm, so that they now seek a total of $207,142.72 for that firm's fees and costs (ECF No. 129-2, pp. 61-62), plus $2,896.95 in costs incurred by the Petitioners themselves (ECF No. 117, p. 3).

<br>

### IV

### MY RULING CONCERNING "REASONABLE BASIS" IN THIS CASE

### A.  Introduction

As noted above, Petitioners filed an application for attorneys' fees and costs ("Application") in this case on June 7, 2016, and Respondent filed an opposition ("Opp.") to that motion on August 8, 2016.  In that Opposition, Respondent argued in detail that Petitioners had no "reasonable basis" for continuing forward with this case after mid-2011, a few months after the "test case" decisions filed in the OAP became final. (Opp., pp. 11-16.)

After considering the overall record of this case and the course of the OAP, I conclude that there was a reasonable basis for *filing* the petition and pursuing it somewhat past the point where the OAP "test cases" (*see* Section II of this Decision above) became final; but I also conclude that, as Respondent argues, by mid-2011 there was *no longer* a reasonable basis to continue pursuing this claim.  Accordingly, I will award no fees and costs incurred after August 31, 2011 (except for the efforts involved in filing this fees application in 2016).

### B.  There was a reasonable basis to file this case, and to pursue the case until a few months after the OAP "test cases" became final.

As set forth above in Section II of this Decision, in the early 2000s major controversies arose as to whether autism spectrum disorders might be caused or otherwise affected by either MMR vaccines or thimerosal-containing vaccines.  Therefore, thousands of parents filed Vaccine Act claims during the early 2000s alleging that their children's ASDs were vaccine-caused.  I and other special masters have generally found that those claims were brought in good faith and with a reasonable basis.  Further, given the scientific uncertainty at the time, I find that the *filing*

of this *particular* petition in 2002, along with thousands like it in the earlier 2000s, was reasonable.  It was further reasonable to keep such claims, including this one, pending until the OAP "test cases" became final in 2010, and for some reasonable period of time thereafter, in order for counsel to digest the complicated science, and to consult with qualified experts to see if a reasonable basis to go forward with the claims could be found.

Accordingly, in this case, I conclude that it was reasonable to file the petition in 2002, given the fact that the autism "test case" rulings had not yet been issued, and to keep the claim pending until after the test case rulings became final in late 2010.  At that point, however, Petitioners' counsel should have carefully studied the test case decisions, along with the medical records of SRH's case, to determine whether there was any feasible chance of demonstrating that SRH's neurodevelopmental disorder was caused or aggravated by any vaccinations.  I conclude that there was *no reasonable basis* for Petitioners to continue this case for more than a brief time after the test cases became final, a point at which *most* petitioners in the 5,000-plus autism cases voluntarily ended their pursuit of their Vaccine Act claims.

### C. There was <u>no</u> reasonable basis to further pursue this case after August 31, 2011.

#### 1. Petitioners' causation claim and evidence in this case

As noted above, Petitioners filed a "Petition for Vaccine Compensation" on behalf of their son SRH on May 10, 2002. (ECF No. 1.)  The Petition alleged that as the direct result of the MMR and Varivax vaccinations that SRH received on February 25, 1999; the Hib vaccination he received on May 26, 1999; "and all the thimerosal containing vaccines" that he had received, SRH "developed Autism." (Petition, ¶¶ 7-8.)  Thus, the petition seemed to contend, as did a great many of the 5,000-plus autism claims, that the "thimerosal" ingredient in a series of vaccinations caused the vaccinee (in this case SRH) to develop autism.

However, as also explained above, the three extensive "test case" opinions, concerning the theory that thimerosal, which contains mercury, can contribute to the causation of autism, all concluded emphatically that the evidence strongly indicated that thimerosal-containing vaccines *do not* contribute to the causation of autism.  Those opinions were issued by three different special masters on March 12, 2010, and were *not* appealed. (See cases cited at p. 6 above.)  Further, three other lengthy "test case" opinions concerning the *MMR vaccine*, issued on February 12, 2009, had all concluded that there is no good evidence that the MMR vaccination can contribute to causing autism, and all three had been resoundingly affirmed by judges of this Court, and two of them further affirmed by separate panels of the U.S. Court of Appeals for the Federal Circuit, by August 27, 2010. (See cases cited at pp. 5-6, above.)

Accordingly, by mid-2011, Petitioners' counsel in this case had had well over a year to study the three (unappealed) "thimerosal" autism test case opinions issued on March 12, 2010.  Further, the latter of the two Federal Circuit decisions rejecting the *MMR vaccine's* alleged role in causing autism had been filed on August 27, 2010.

In late 2010 and early 2011, special masters of this Court filed Orders in all of the 5,000-plus autism cases, questioning whether the petitioners in each case wished to further pursue their cases, in light of the autism test case results.  As noted above, at that point the vast majority of those autism petitioners elected either to withdraw their claims, or to request that the special

master file a decision denying their claim on the written record, resulting in a brief decision rejecting the petitioner's claim for lack of support.

In this case, I issued such an Order to Petitioners on May 19, 2011. (ECF No. 20.) Unlike in most of the autism cases, however, in this case Petitioners' attorney filed a response indicating that Petitioners wanted to *continue* to pursue their claim. That response came in the form of an Amended Petition filed on July 20, 2011, which alleged that as a "direct result" of his MMR vaccination of February 25, 1999, and his Hib vaccination of May 26, 1999, SRH developed "mercury poisoning." (ECF No. 22, ¶¶ 7, 8, 15, 18.) (This allegation was somewhat peculiar, since one of the two named vaccines, the MMR, does *not* contain mercury.)

Petitioners later filed (on March 9, 2015), a Second Amended Petition, which again alleged that SRH developed "mercury poisoning" as the direct result of his MMR vaccination of February 25, 1999, and his Hib vaccination of May 26, 1999. (ECF No. 90, ¶¶ 7, 8, 16, 20.)

After Petitioners filed their (first) Amended Petition on July 20, 2011, despite my warning during the status conference of August 2, 2011, and the further warning contained in the written Order filed on August 15, 2011, Petitioners elected to *continue* to file evidence allegedly supporting their "mercury poisoning" claim (as noted above, an amount of mercury is part of the preservative known as "thimerosal" used in some childhood vaccines). After seeking many extensions of time to file such evidence, Petitioners finally filed an expert report, of Dr. Mark Geier, on June 6, 2013. (Ex. 17, ECF No. 36-2.) On October 4, 2013, they filed an extensive set of documents from SRH's father Dr. Brian Hooker, who is not a medical doctor. (ECF No. 44.) They further filed, also on October 4, 2013, five more expert reports, including another report from Dr. Mark Geier. (ECF Nos. 45-46.) Petitioners then sought additional time to file the report of yet another expert, Dr. Frances Kendall. (ECF No. 52.) Petitioners subsequently filed a series of motions, each requesting additional time to file such report, and those motions were granted, but on the ultimate due date for Dr. Kendall's report, Petitioners instead filed the expert report of Mary Megson, M.D. (*See* Ex. 32, ECF No. 58-2, filed April 18, 2014.)

On January 22, 2015, Respondent filed the reports of three medical experts, along with medical literature. (ECF No. 83.) On May 18, 2015, Petitioners filed a status report indicating that Petitioners did not wish to file any further expert reports.

### 2. My Decision rejecting Petitioners' causation claims

On May 19, 2016, I filed my Decision rejecting Petitioners' causation claims. While I indicated my sympathy for SRH and his family, I found Petitioners' claim to be wholly without merit. I found that the Petitioners' experts were very poorly qualified, sometimes scandalously so, and very unpersuasive in their reports. I found that Respondent's expert reports were quite persuasive. I found that Petitioners' theory of causation, that SRH was injured by the mercury contained in the thimerosal ingredient of one or more of SRH's vaccinations, was *exactly the same theory* rejected at extreme length and detail in the petitioners' "second theory" "test cases" in the OAP. In short, I found *absolutely no merit* in any of Petitioners' causation evidence advanced in this case.

### 3. *The lack of reasonable basis to pursue this case after August 31, 2011*

As demonstrated by (1) the summary of Petitioners' causation claim and evidence, and (2) the summary of my lengthy decision completely rejecting that claim, it is very clear that Petitioners and their experts presented an *extremely defective* causation claim in this case. I conclude that Petitioners' entire presentation of expert reports, medical literature, and the filings of Dr. Hooker himself, were so defective that their presentation was, in essence, frivolous.

#### a. *Petitioners' experts were completely unqualified and unpersuasive, some with a history of severe professional disciplinary sanctions.*

In my Decision filed on May 29, 2016, in this case, I described at considerable length the very poor qualifications of the experts upon whom the Petitioners relied in this case, and the unpersuasiveness of their written reports. (2016 WL 3456435, at *13-18, 29-38.)  I will highlight a few examples here.

#### i. *Mark Geier, M.D.*

The first expert report filed was that of Dr. Mark Geier, and it was shocking to me that in 2013 any Vaccine Act attorney would rely on Dr. Geier, for several reasons.

First, in *King v. HHS*, No. 03-584V, 2010 WL 5470787, at *5-17 (Fed. Cl. Spec. Mstr. Dec. 13, 2010),[15] I found that it would be unreasonable for the Vaccine Program to compensate counsel for paying Dr. Geier and his co-authors for writing a medical article.  In that ruling, I described in great detail a multitude of criticisms of Dr. Geier's past expert reports and court testimony, both by many special masters of this court and by judges of other courts.  Those criticisms related both to conclusions that Dr. Geier lacked honesty and candor, and to his willingness to testify concerning medical areas in which he was not qualified. (*Id*. at *10-15.)

Further, exhibits filed in this case show that the Maryland State Board of Physicians ("Board") suspended Dr. Geier's license to practice medicine on April 27, 2011 (Ex. B, ECF No. 41-2, p. 46), and then *revoked that license* on August 22, 2012. (Ex. A, ECF No. 41-1, p. 15.) Even more disappointingly, when Petitioners' counsel filed a *curriculum vitae* of Dr. Geier on October 4, 2013, the fact that his medical license had been suspended and later revoked was *not mentioned*. (Ex. 24.)  Further, those exhibits also showed that the Board, in fact, based its actions against Dr. Geier specifically on a review of Dr. Geier's medical care for multiple patients *afflicted with ASDs*.  Among the many reasons given by the Board for revoking Dr. Geier's medical license were:  a) his failure to meet basic medical standards for evaluating patients and keeping adequate records (Ex. A, p. 2); b) his prescriptions of risky "chelation" therapy to patients who did not need chelation (*id.*, p. 3); c) his administration of medications not approved by the Food and Drug Administration, without obtaining adequate informed consent, and his failure to properly monitor the outcome of such treatments (*id.*, p. 4); and d) his willful

---

[15]      That *King* opinion was remanded to me for additional consideration, but on remand I issued another opinion that reached the same conclusion, based on the same evidence, concerning Dr. Geier.  *See King v. HHS*, No. 03-584V, 2011 WL 5926126 (Fed. Cl. Spec. Mstr. Sep. 22, 2011).

falsification of his professional credentials (*id.*, p. 5).  The Board concluded that Dr. Geier had displayed "an almost total disregard of basic medical and ethical standards" (*id.*, p. 14), and that, "[i]n plain words, Dr. Geier exploited these patients under the guise of providing competent medical treatment" (*id.*, p. 15).

Further, while Dr. Geier has published many medical articles concerning ASDs, the Institute of Medicine[16] has evaluated a number of these articles and concluded that they are riddled with problems, and thus are essentially without any value whatsoever in terms of contributing to the study of the causation of ASDs.  *See King v. HHS*, 2010 WL 5470787, at *12-14; Institute of Medicine, *Immunization Safety Review: Vaccines and Autism* (2004), filed on compact disc on June 2, 2015, as Respondent's Ex. BBB, pp. 55-62.[17]

### ii. Stephen Smith, M.D.

The *curriculum vitae* of another of Petitioners' experts, Dr. Stephen Smith, was never filed.  Thus, the only filed information concerning Dr. Smith's educational background and qualifications consists of his own brief statements about his practice contained in his expert report, plus copies of disciplinary rulings against him by a state regulatory agency.[18]  Those rulings indicate that Dr. Smith graduated from medical school in 1980, and received a license to practice medicine in June 1981.  (Ex. J, p. 6 of 12.)  He did not complete any medical residency (*id.*), and is not board-certified in any medical specialty (Ex. K, p. 2, ¶ 2.1).  He "practices allopathic medicine as well as alternative medicine."  (Ex. J, p. 6 of 12.)

---

[16]     The Institute of Medicine is the medical arm of the National Academy of Sciences.  The National Academy of Sciences ("NAS") was created by Congress in 1863 to be an advisor to the federal government on scientific and technical matters (*see* An Act to Incorporate the National Academy of Sciences, 37 Cong. Ch. 111, 12 Stat. 806 (1863)), and the Institute of Medicine ("IOM") is an offshoot of the NAS established in 1970 to provide advice concerning medical issues.  (Ex. BBB, p. iv.)  When it enacted the Vaccine Act in 1986, Congress specifically directed that the IOM conduct studies concerning potential causal relationships between vaccines and illnesses.  (§ 300aa-1 note.)

[17]     Mr. Shoemaker has previously shown astoundingly poor judgment in attempting to bill the Program for amounts to be paid to Dr. Geier.  For example, in one case, Mr. Shoemaker, almost unbelievably, attempted to bill the Program for the costs of a trip by himself, Dr. Mark Geier, and David Geier to France and Italy, allegedly to interview medical experts.  The special master denied the claimed costs, labelling the attempt to bill such costs as an "extreme example of [Mr. Shoemaker's] error in billing judgment." *Riggins v. HHS,* No. 99–382V, 2009 WL 3319818, at *12-13 (Fed. Cl. Spec. Mstr. June 15, 2009), *aff'd by unpublished order* (Fed. Cl. Dec. 10, 2009), *aff'd,* 406 Fed. Appx. 479 (Fed. Cir. 2011).

[18]     Respondent filed copies of official documents which describe disciplinary actions taken by the Department of Health of the State of Washington, against Stephen L. Smith, M.D., in 2007 and 2014.  (Ex. J, ECF No. 83-8; and Ex. K, ECF No. 83-9, both filed on January 22, 2015.)

Further, the above-mentioned disciplinary actions against Dr. Smith are directly relevant to the issues presented in this case.  Exhibit J describes the ruling of the Washington State Medical Quality Assurance Commission ("Commission") in 2007, concerning Dr. Smith's prescription of "multiple traditional and non-traditional medications" to a teenage patient that Dr. Smith diagnosed as suffering from "mercury toxicity." (Ex. J, pp. 6-7 of 12.)  The Commission determined that Dr. Smith subjected the patient to risky treatment without proper justification. (*Id*., pp. 7-8.)  The Commission determined that Dr. Smith's actions constituted unprofessional conduct. (*Id*., p. 9.)

Exhibit K describes a ruling in 2014, concerning Dr. Smith's treatment of a different teenager, who had been diagnosed with autism.  (Ex. K, p. 2 of 10.)  In that case, Dr. Smith diagnosed a "toxic encephalopathy" related to lead poisoning (*id*., p. 4), and used a risky procedure known as "chelation" to treat the alleged excess lead in the patient's system (*id*., pp. 2-3).  The Commission identified multiple failures by Dr. Smith to meet the standard of care for this patient, including his diagnosis of "toxic encephalopathy or lead poisoning despite the fact that there was no evidence to support this diagnosis." (*Id*., pp. 3-4.)  As a result of these findings, the Commission imposed a fine and prohibited Dr. Smith from treating patients under the age of 18. (*Id*., pp. 5-6.)

### iii.  Mr. David Geier

Petitioners' counsel also submitted as an "expert" report a report from Mr. David Geier, the son of Dr. Mark Geier.  However, David Geier, according to his own *curriculum vitae,* lacks any sort of medical education or training. (*See generally* Ex. 22.)  In fact, his most significant qualification is a Bachelor of Arts degree, with a major in biology. (*Id*., p.1.)  Further, David Geier was a co-author with his father on most of the medical articles described above, found by the Institute of Medicine to be worthless.  *See King v. HHS,* 2010 WL 5470787, at *12-14.

I also note that in *Riggins v. HHS*, No. 99–382V, 2009 WL 3319818, at *6–7 (Fed. Cl. Spec. Mstr. June 15, 2009), *aff'd*, 406 Fed. Appx. 479 (Fed. Cir. 2011), Special Master Golkiewicz found that David Geier was "not qualified to serve as a consultant on the medical issues presented in the Vaccine Program."  I reached the same conclusion in *King v. HHS*, 2010 WL 5470787, at *20.

### iv.  Janet Kern, Ph.D.

Janet Kern has collaborated with both of the above-mentioned Geiers in producing many research papers.  Their expert opinions concerning the alleged hazards of thimerosal-containing vaccines are very similar.  *See Hooker v. HHS*, 2016 WL 3456435, at *30-33.  Dr. Kern commenced her collaboration with the Geiers in 2009, even though the Geiers' previous medical research had been severely criticized as described above, and her decision to commence that collaboration reflects poorly on her credibility. (*Id*. at *32.)  Further, Dr. Kern's opinion was persuasively criticized by Respondent's highly qualified expert witness medical doctors, Drs. Raymond and Cetaruk. (*Id*. at *37-38.)

### v. *Boyd Haley, Ph.D.*

Like Janet Kern, Boyd Haley is not a medical doctor, and his expert report was strongly rebutted by Respondent's much better-qualified medical doctor, Dr. Cetaruk.  *See Hooker v. HHS*, 2016 WL 3456435, at *33, 37.

### vi. *Mary Megson, M.D.*

Dr. Megson is, at least, a medical doctor, a pediatrician, and has considerable experience treating children with ASDs.  *Hooker*, 2016 WL 3456435, at *33.  However, her expert report was effectively rebutted by Respondent's much better-qualified experts, Drs. Raymond and Cetaruk. (*Id*. at *37-38.)  I found her expert report to be wholly unpersuasive.[19]

### vii. *Summary concerning Petitioners' expert reports*

It was shocking to me that Petitioners' counsel *even filed* the reports of Dr. Mark Geier, Dr. Stephen Smith, and David Geier, in light of the above-described rejection by the Institute of Medicine of the works of the two Geiers, the complete lack of qualifications of David Geier, and the condemnations of both Dr. Geier and Dr. Smith by the medical boards of their respective states.

Further, the reports of the two Ph.D.s, Boyd Haley and Janet Kern, and the report of Dr. Megson, were also totally unpersuasive, for the reasons stated in the pages above and in my Decision on the merits in this case. *See Hooker,* 2016 WL 3456435 at *28-38.

Accordingly, I found that the very poor quality and complete lack of persuasiveness of the expert reports that the Petitioners filed in this case supports my conclusion that it was *quite unreasonable* for Petitioners' counsel to pursue this case after August of 2011.[20]

### b. *The medical records plainly contradict Petitioners' key factual allegations.*

Another strong reason for finding that there was no reasonable basis to pursue this case after August of 2011, is that SRH's medical records *plainly contradict* several of Petitioners' key factual allegations as to the timing or existence of symptoms in SRH.

---

[19]      In addition, in another decision, after hearing Dr. Megson testify orally in person that an autism patient's disorder was vaccine-caused, I found Dr. Megson's testimony to be exceedingly unpersuasive. *Long v. HHS*, No. 08-792V, 2015 WL 1011740, (Fed. Cl. Spec. Mstr. Feb. 9, 2015) at *19.  I also note that another special master has evaluated Dr. Megson's testimony, and similarly found her testimony to be poorly presented and unreliable. *Doe 21 v. HHS*, No. 02-411V, 2009 WL 3288295, at *19-20 (Fed. Cl. Spec. Mstr. Jan. 16, 2009), *vacated and remanded on other grounds*, 88 Fed. Cl. 178 (2009), *reinstated sub. nom.*, *Paterek v. HHS*, 527 F. App'x 875 (Fed. Cir. 2013).

[20]      I have also considered the filings of Dr. Hooker himself, but, as explained in my Decision of May 19, 2016 (*Hooker*, 2016 WL 3456435 at *38-39), I found no substantial support for Petitioners' case in Dr. Hooker's filings, and those filings do not indicate that there was any reasonable basis to pursue this case.

### i. *The first symptoms of SRH's autism appeared <u>prior to when</u> <u>Petitioners alleged.</u>*

From the beginning of this litigation, Petitioners have contended that the first symptom of SRH's autism took place shortly after his vaccination of *May 26, 1999*. (*E.g.*, Petition, ECF No. 1, ¶ 9; (first) Amended Petition, ECF No. 22, ¶ 9.)  However, SRH's records tell a different story, indicating that SRH was exhibiting the *initial onset* of a neurodevelopmental disorder, later diagnosed as an autism spectrum disorder, *prior* to May 10, 1999.  First, SRH's pediatrician, Dr. Heller-Bair, carefully recorded SRH's developmental progress during most pediatric visits during his first 15 months of life, using the Denver II Developmental Screening Test. (Ex. 35, pp. 4, 5, 11, 13, 24.)  This screening tool allows medical personnel to indicate a "pass" ("P") or "fail" ("F") for each infant milestone, on a chart divided into age groups.  At four months of age, Dr. Heller-Bair noted "fail" for three developmental milestones that SRH had not achieved. (Ex. 35, p. 24.)  At six months of age, there are notations indicating that SRH failed to achieve three milestones. (*Id.*)  At nine months, he failed two milestones, as he was not using "mama/dada" and could not sit up alone. (*Id.*)  At his twelve-month check-up, on February 25, 1999, he could speak only two words, and was not yet able to drink from a cup. (*Id.*)

Second, Respondent's expert witness Dr. Bennett Leventhal, with by far the best qualifications regarding the study of ASDs of any expert who filed reports for either party in this case, reviewed SRH's medical records in exhaustive detail, and presented the following opinion regarding the time of onset of SRH's ASD.

> There is little doubt that [SRH's] early onset neurodevelopmental disorder began as early as 4 months of age.  *Certainly, early signs of developmental disruption were present by 4-8 months of age* (trouble with changes in routine, sleep problems, noise hypersensitivity, staring at lights) with increasing evidence culminating in virtual certainty not later than 15 months of age when he was below expected levels on developmental examinations.

(Ex. C, p. 31, emphasis added.)

Dr. Leventhal also pointed to a lengthy list of unusual features of SRH's medical history exhibited *prior* to May 10, 1999, indicating the onset of ASD symptoms prior to that date. (Ex. C, pp. 29-30 of 35, ¶¶ a through h.)  Included in that list of symptoms were a number of features that are particularly indicative of autism.  For example, at his check-up on October 17, 1998, it was noted that SRH had "noise sensitivity." (Ex. 35, p. 7.)  Dr. Leventhal pointed to that record, and explained that noise sensitivity "is a symptom associated with ASD (Autism Spectrum Disorder)." (Ex. C, p. 6; see also further discussion of noise sensitivity in SRH as a symptom of ASD by Dr. Leventhal at Ex. C, p. 7.)

Also included in Dr. Leventhal's list of early symptoms of a developmental disorder was another symptom particularly indicative of ASD -- "evidence of language delay and reports of social interaction problems" at age 12 months. (Ex. C, p. 30 of 35, ¶ g.)  Language delay and social interaction problems are *classic* symptoms of autism.  *See, e.g.*, *Snyder v. HHS*, No. 01-162V, 2009 WL 332044, at *31 (Fed. Cl. Spec. Mstr. Feb. 12, 2009).

Third, several representations by the *Petitioners themselves* indicate that SRH was suffering from developmental problems, likely early symptoms of his ASD, well prior to May 10, 1999.  For example, SRH's parents reported that at one year of age (about February 10, 1999), he seemed "delayed in interactive skills."  (Ex. 2, p. 46.)  On September 14, 1999, SRH's parents reported that they had been worried about developmental delays "for about 6 months," which would put the onset around March of 1999.  (Ex. 6, p. 19.)  And on occasions, SRH's parents identified the onset of SRH's developmental problems as occurring about the time of his *MMR* vaccination, which took place on February 25, 1999.  (See Ex. 5, p. 30 (SRH lost eye contact "after his MMR shot"); Ex. 14, p. 38 ("delays, deterioration of verbal skills coincidental [with] MMR")).

Accordingly, it was unreasonable for Petitioners' counsel to pursue this case when the medical records, and Petitioners' own statements quoted above, contradicted the key factual allegations of Petitioners' causation theory.

### ii.  Some of Petitioners' other key factual allegations were contradicted by the medical records.

Another reason that it was unreasonable for Petitioners' counsel to pursue this case past August of 2011 is that several other key representations of Petitioners concerning SRH's medical history were *contradicted* by the contemporaneous medical records.

For example, Petitioners represented to Dr. Smith that SRH experienced a "regression" within two weeks of his 15-month vaccinations on May 26, 1999 (Ex. 29, p. 1),  and to Dr. Megson that SRH experienced "a prolonged fever," "chronic inflammation," and "regressive encephalopathy" after those same vaccinations (Ex. 32, p. 12).  However, the medical records *contradict* both the allegations of a "regression" within two weeks of May 26, 1999, and also Dr. Megson's statements that SRH experienced "prolonged fever," "chronic inflammation," and "regressive encephalopathy" soon after May 26, 1999.

In this regard, I note first that I have carefully reviewed the contemporaneous records created around that time period, and have found no medical notations at all created between May 26, 1999, and June 8, 1999.  Therefore, during those two weeks, SRH apparently did *not* exhibit any adverse symptoms that seemed significant enough to result in a trip to his health care providers -- which certainly makes it seem impossible that SRH was in fact suffering, during those two weeks, any of the symptoms upon which Dr. Smith and Dr. Megson relied.

Even more importantly, SRH did visit physicians on several occasions between June 8 and June 30, 1999, and *none* of those records indicate that in late May and early June SRH had undergone a "regression," "prolonged fever," "chronic inflammation," or "regressive encephalopathy," as stated by Drs. Smith and Megson.  Those records, in fact, indicate to the *contrary*.

On June 8, 1999, SRH's parents brought him to the office of Dr. Randall Fong, an otolaryngologist, for an evaluation before surgery to place ear tubes. (Ex. 7, p. 4.)  Dr. Fong noted SRH's ongoing ear issues, and an extensive pre-operative discussion with his parents, during which "all questions were answered, and informed consent was obtained." (*Id.*)  There were no parental concerns noted regarding the recent onset of any neurological problems.

Six days later, on June 14, 1999, the pediatrician, Dr. Heller-Bair, examined SRH because he had a fever.  (Ex. 35, ECF No. 62-3, p. 14.)  She recorded that he presented with a "1-day history of low-grade fever, irritability, decreased appetite, nasal congestion." (*Id.*) Dr. Heller-Bair diagnosed a viral upper respiratory infection, but declined to prescribe antibiotics, and reassured SRH's mother that he did not have an ear infection at that time.  (*Id.*)

On June 16, 1999, Dr. Fong performed another pre-operative examination of SRH. (Ex. 7, filed Sept. 7, 2007, p. 5.)  He concluded that SRH appeared to be recovering from a viral illness, but he planned to proceed with the insertion of ear tubes on June 18, 1999, if there was no recurrence of fever.  (*Id.*)  Dr. Fong's pre-operative assessment, once again, did not describe any symptoms suggestive of a "regression" or neurodevelopmental problems of any kind.  SRH, in fact, had his ear tube surgery on June 18, as planned, and Dr. Fong performed another complete examination just before that procedure.  (Ex. 10, filed Sept. 7, 2007, p. 107.)  He characterized SRH as a "well-developed, well-nourished white male in no acute distress." (*Id.*) After the surgery, on June 30, 1999, Dr. Fong re-examined his patient and conducted a hearing test.  (Ex. 7, p. 6.)  The physical exam was unremarkable, while SRH's conductive hearing loss was somewhat "improved." (*Id.*)

Then, notably, for ten weeks, between June 14 and August 30 of 1999, SRH's parents did *not* bring him for evaluation by his pediatrician.  There were *no* reports to Dr. Heller-Bair of adverse neurodevelopmental symptoms during this time period, although Petitioners in this case have claimed that SRH suffered a "toxic encephalopathy" or a "regression" soon after May 26, 1999.

In short, there is nothing in any of these many medical records, created during June 1999, that would lend any support at all to Petitioners' representation to Dr. Smith that SRH suffered a "regression" within two weeks after the vaccinations of May 26, 1999.  Certainly, these physicians, especially the treating pediatrician, would have commented on such a regression if symptoms had actually appeared during the time period just prior to these physician visits.

Moreover, these physician records of June 1999 also directly contradict the representations that Petitioners apparently made to *Dr. Megson*.  Note that Dr. Heller-Bair on June 14 noted only a "1-day history of low-grade fever." (Ex. 35, p. 14.)  This report of a "one-day" low-grade fever contradicts several allegations of fact in Dr. Megson's report, including her statements that after the May 26 vaccinations SRH experienced a "prolonged fever" (Ex. 32, p. 12); a fever from "May 26, 1999 to June 14, 1999,*** for 2 weeks" (Ex. 32, p. 3); and a fever "for 18 days"  plus "3 additional days" (Ex. 32, p. 11).

Further, while Dr. Megson stated that SRH also experienced "chronic inflammation" and "regressive encephalopathy" after the May 26 vaccinations, the lack of any physician visits between May 26 and June 8, and particularly the above-described records of June 8 through June 30, also contradict those representations made to Dr. Megson.

24

### iii.  Summary concerning the contradiction of Petitioners' factual claims by the medical records

In short, as explained above, the key *factual* representations upon which Petitioners' causation claim was based were contradicted by the medical records.  Therefore, it was not reasonable for Petitioners' counsel to pursue this case when it was so plainly contradicted.

### c.  Petitioners relied in this case on the <u>same</u> causation theory that was <u>rejected</u> in the OAP "test cases."

A third strong reason, for concluding that there was no reasonable basis for Petitioners' counsel to pursue this case past August of 2011, is that Petitioners' causation theory was exactly the *same* causation theory that was resoundingly rejected in the second group of OAP "test cases" described above.

That is, the causation theory upon which the Petitioners relied in this case, the theory that the mercury-based "thimerosal" preservative contained in certain vaccines can cause or aggravate ASDs, was litigated at *extreme length* in the second group of three OAP "test cases," as explained above.  Three different special masters, after listening to weeks of testimony from multiple ASD experts from around the world, and studying multiple medical studies from around the world concluding that there was no evidence of any correlation between thimerosal-containing vaccines and ASDs, each wrote very extensive opinions (310, 169, and 117 pages, respectively, single-spaced, in length), finding no persuasive evidence of a causal link between thimerosal-containing vaccines and autism, and finding that the available evidence indicated strongly *to the contrary. Mead v. HHS*, No. 03-215V, 2010 WL 892248 (Fed. Cl. Spec. Mstr. Campbell-Smith Mar. 12, 2010); *Dwyer v. HHS*, No. 03-1202V, 2010 WL 892250 (Fed. Cl. Spec. Mstr. Vowell Mar. 12, 2010); *King v. HHS*, No. 03-584V, 2010 WL 892296 (Fed. Cl. Spec. Mstr. Hastings Mar. 12, 2010).  Those three opinions detailed several major, very persuasive reasons to reject the theory that thimerosal-containing vaccines can contribute to the causation or aggravation of autism.  Some examples are noted below.

First, while different forms of mercury clearly can be quite harmful to humans at substantial doses (depending on the type of mercury), there is extensive scientific evidence showing clearly that the type of mercury contained in thimerosal-containing vaccines is *not* harmful to humans in the small amounts contained in thimerosal-containing vaccines. *E.g., King v. HHS*, 2010 WL 892296 at *29.

Second, extensive scientific evidence shows that when mercury *is* harmful to humans -- that is, when the human brain is exposed to dosages of mercury *far higher* than the amounts present in all the thimerosal-containing vaccines that a young child would receive -- the harm looks *nothing like autism. E.g., King*, 2010 WL 892296 at *30.

Third, autopsy studies, comparing brains of autistic children to those of non-autistic children, indicate that autistic brains show a number of abnormal features that necessarily would have occurred during specific parts of the *prenatal period*, contradicting the theory that vaccinations received after birth could cause autism.  *E.g., King*, 2010 WL 892296 at *32.

Fourth, in the several years after the theory was first proposed that thimerosal-containing vaccines could cause ASDs, a large number of *epidemiological studies*[21] were carried out, in many countries world-wide, specifically to explore whether there was any association between exposure to thimerosal-containing vaccines and the occurrence of autism. *All* of the competent, well-designed studies reached the conclusion that *no association* between thimerosal-containing vaccines and autism had been shown. *E.g., King*, 2010 WL 892296 at *63-67, 75.

Fifth, a number of prestigious medical groups, including the Institute of Medicine; the World Health Organization; the American Academy of Pediatrics; the European Agency for the Evaluation of Medical Products; the U.S. Centers for Disease Control and Prevention; and the National Advisory Committee on Immunization of the Public Health Agency of Canada, have concluded that the scientific evidence does *not* support a causal relationship between thimerosal-containing vaccines and autism. *E.g., King*, 2010 WL 892296 at *75-77.

### D. Summary concerning "reasonable basis" issue

At the time that this case was *filed*, there was considerable uncertainty concerning how claims alleging that vaccines could contribute to the causation of autism would fare in this Court, so I have concluded that it was reasonable to file this case and to pursue it for a reasonable amount of time thereafter. However, for the reasons set forth in detail in the sections of this Decision immediately above, I conclude that Petitioners' case *ceased* to have a reasonable basis after the end of August of 2011.

In short, by August 31, 2011, Petitioners' counsel had had well over a *year* to analyze the extensive and extremely detailed analysis of those three "test-case" opinions, which rejected the *same theory* advanced by Petitioners in this case.[22] *Dwyer v. HHS*, No. 03-1202V, 2010 WL 892250 (Fed. Cl. Spec. Mstr. Mar. 12, 2010); *King v. HHS*, No. 03-584V, 2010 WL 892296 (Fed. Cl. Spec. Mstr. Mar 12, 2010); *Mead v. HHS*, No. 03-215V, 2010 WL 892248 (Fed. Cl. Spec. Mstr. Mar. 12, 2010).

Counsel also had more than two years to study the three lengthy special master decisions concerning the other causation theory advanced by the petitioners in the OAP, concerning the MMR vaccine, and even a year to study the very last of the five appellate decisions strongly affirming the three special master decisions. *Cedillo v. HHS*, No. 98-916V, 2009 WL 331968 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), *aff'd*, 89 Fed. Cl. 158 (2009), *aff'd*, 617 F.3d 1328 (Fed. Cir. 2010); *Hazlehurst v. HHS*, No. 03-654V, 2009 WL 332306 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), *aff'd*, 88 Fed. Cl. 473 (2009), *aff'd*, 604 F.3d 1343 (Fed. Cir. 2010); *Snyder v. HHS*, No. 01-162V, 2009 WL 332044 (Fed. Cl. Spec. Mstr. Feb. 12, 2009), *aff'd*, 88 Fed. Cl. 706 (2009).

---

[21]    Epidemiology is "the study of the factors determining and influencing the frequency and distribution of disease, injury, and other health-related events and their causes in a defined human population." *Dorland's Illustrated Medical Dictionary* (32nd ed. 2012), p. 631.

[22]    It is further indicative of the *extremely illogical* causation presentation in this case that in the Petitioners' (first) Amended Petition and Second Amended Petition, Petitioners continued to rely on their thoroughly rejected "mercury poisoning" theory, yet pointed to only two vaccinations, one of which, the MMR vaccination, does not even contain thimerosal or any form of mercury. (ECF No. 22, ¶¶ 7, 8, 15; ECF No. 90, ¶¶ 7, 8, 16.)

(The last of those decisions to be filed was the Federal Circuit's affirmance of *Cedillo*, on August 27, 2010.)

But counsel continued to move forward with a causation theory that had been thoroughly rejected and discredited.  He moved forward by filing the expert reports of a collection of totally unimpressive and unpersuasive expert witnesses -- two of whom had been severely sanctioned by their state medical boards, one of whom (David Geier) had no qualifications whatsoever, and the balance consisting of two Ph.D.s and one medical doctor whose expert reports were completely unpersuasive.  He moved forward based upon factual representations by his clients which were in fact *strongly contradicted* by SRH's medical records.  And he moved forward despite *two specific warnings* from me, orally on August 2, 2011, and in a written Order filed on August 15, 2011, that if Petitioners continued to move forward with their flawed, rejected, and discredited causation theory, it was questionable whether they would receive compensation for pursuing the case beyond that point.

Based on these factors, I find that there was *no reasonable basis* for Petitioners' counsel to continue to pursue their case after the end of August of 2011, and I will make no award for fees and costs incurred after that date, except for a small amount awarded for filing the fees and costs application.[23]

---

[23]     Other special masters have reached similar conclusions in other Vaccine Act cases. The adequacy of an attorney's investigation into the *factual basis* of a petitioner's claim has been found to be key to determining whether reasonable basis existed for a claim. *Di Roma v. HHS*, No. 90-3277, 1993 WL 496981, at *2 (Fed. Cl. Spec. Mstr. Nov. 18, 1993) ("Case law teaches us that basic inquiries are required prior to the filing of any paper under the Act," citing *Lamb v. HHS*, 24 Cl. Ct. 255, 258–59 (1991)). Although in the history of the Vaccine Program special masters have tended to be generous in finding a reasonable basis to grant fee awards in unsuccessful cases, that generosity does not extend to situations in which counsel fails to sufficiently investigate the facts underlying the claim, or persists in litigating a case when the evidence is clearly insufficient. *Riley v. HHS*, No. 09–276V, 2011 WL 2036976, at *3 (Fed. Cl. Spec. Mstr. Apr. 29, 2011); see also *Murphy v. HHS*, 30 Fed. Cl. 60, 62 (1993) (affirming denial of attorneys' fees where contemporaneous records provided no basis for alleged injury), *aff'd*, 48 F.3d 1236 (Fed. Cir. 1995); *Di Roma*, 1993 WL 496981 at *3 (denying attorney's fees and costs where "[m]inimal research and good sense should have indicated that this case had no basis under the law."); *Curran v. HHS*, 2016 WL 4272069, at *3 (Fed. Cl. Spec. Mstr. June 16, 2016), *aff'd in relevant part*, 130 Fed. Cl. 1, 7-8 (2016).

Further, special masters have held that the reasonableness of a claim must be re-examined at various stages of the proceeding. *Riley*, 2011 WL 2036976, at *8 (admonishing counsel to "ensure that a reasonable basis is present at *every* stage of the case") (emphasis in original). If a petitioner's efforts to address questions and concerns about a vaccine claim reveal critical deficiencies, dismissal of the petition may be appropriate, and reasonably incurred attorneys' fees and costs, *to that point*, may be awarded. *Stevens v. HHS*, No. 90-221V, 1992 WL 159520, at *3 (Cl. Ct. June 9, 1992), *aff'd*, 996 F.2d 1236 (Fed. Cir. 1993).  In addition, prompt and responsive action by counsel is encouraged in Program proceedings once a claim's serious shortcomings have been identified and the reasonableness of maintaining the claim is

# V

## PETITIONERS' ARGUMENTS CONCERNING "REASONABLE BASIS"

In their reply memorandum filed on October 19, 2016 ("Reply"), Petitioners' counsel countered Respondent's arguments concerning "reasonable basis." (ECF No. 129.)  I have carefully considered Petitioners' arguments in that regard, and find merit in *some* of them.  I have taken those arguments into account in reaching my findings concerning "reasonable basis" in Section IV of this Decision.

For example, Petitioners first argue (Reply, pp. 1-2) that it was reasonable to *originally file* the case, and to continue to pursue it through August of 2011.  I agree, for the reasons set forth above.

Petitioners also argue that it was reasonable for them to continue to seek evidence for their theory after August of 2011.  They contend that, during the digitally recorded status conference held on August 2, 2011, the undersigned special master "instructed" them "to find other theories"-- *i.e.*, theories other than the previously-discredited "mercury poisoning" theory advanced in their Petition and their (first) Amended Petition. (Reply, p. 3, line 3; *see also* Reply, pp. 2-4 generally.)  This argument is misleading, and not persuasive.  In neither the status conference of August 2, 2011, or in my follow-up Order filed on August 15, 2011, did I "instruct" Petitioners to "find other theories." Rather, in both instances I warned Petitioners' counsel that *if* they continued to pursue the *same* theory that was thoroughly rejected in the "second theory" OAP test cases, their further efforts would likely *not be considered reasonable*. In light of those warnings, Petitioners and their counsel *could have*, like most of the Vaccine Act autism petitioners, withdrawn their claim or sought a ruling denying their claim on the written record. (See discussion at p. 6 above.)  Or they could have instead advanced a different theory, with at least some credibility.  Petitioners and their counsel took neither of those options. Instead, they proceeded with the same discredited theory for four more years, supplying as "evidence" for that theory only the dismal collection of alleged "expert" reports discussed at length above, and the completely unpersuasive set of materials presented by SRH's father, who is not a medical doctor.

Thus, having ignored my warnings, and having chosen to present a frivolous theory, Petitioners' argument that their counsel should be awarded over $200,000 in Program funds for vainly seeking support for that frivolous theory, is wholly unpersuasive.

---

called into question. Compare *Riley*, 2011 WL 2036976, at *7-8 (awarding fees when counsel acted quickly in winding down a case after recognizing that it was no longer reasonable to continue), and *Turner v. HHS*, No. 99-544V, 2007 WL 4410030, at *10 (Fed. Cl. Spec. Mstr. Nov. 30, 2007) (awarding partial fees when counsel promptly moved for judgment on the record upon recognizing the deficiencies in the claim), with *Stevens*, 1992 WL 159520, at *3-4 (denying fees when petitioners' counsel "failed to react" to the ample notice provided of the factual shortcomings of the case); and *Curran*, 2016 WL 4272069, at *3 (denying fees for the time period after the claim's defects became clear).

In this regard, Petitioners' counsel also argues that he should be compensated for his activities after August of 2011, because he allegedly had an "ethical obligation" to "represent Petitioners' position." (ECF No. 129, p. 4.)  I cannot agree.

To be sure, as counsel for Petitioners, Mr. Shoemaker would have an obligation, if he remained their counsel, to present whatever arguments his clients instructed him to make, *if* he found such arguments to be reasonable.  However, Mr. Shoemaker has much experience representing Vaccine Act claimants, including autism claimants, and thus seeks a very high hourly rate (at $430 per hour for work in 2016) on account of his experience.  Mr. Shoemaker plainly should have realized, by the end of August 2011 *at the latest*, that the causation claim that Petitioners wished to pursue in this case was not only contradicted by the facts of the case, but was *also* contradicted by all available reliable scientific knowledge, and thus amounted to a frivolous claim in this case.  Mr. Shoemaker, as an officer of the court, had an ethical obligation to tell that to his clients, and, if he could not influence them, to *withdraw* from representing these Petitioners.  It was *not* reasonable for him to, instead, continue to pursue the claim, and thereby require the presiding special master to spend time writing a 58-page opinion evaluating the Petitioners' unpersuasive and frivolous claim.[24]  And it is certainly not reasonable for him now to seek more than $200,000 in Program funds to compensate him for his ill-advised and futile efforts at pursuing such a frivolous claim over the four following years, from 2011 to 2015.

In short, I have reached the conclusions concerning "reasonable basis" set forth in Section IV above, after carefully considering the arguments of Petitioners' counsel in his Response filed on October 19, 2016.

# VI

## OBJECTIONS RAISED BY RESPONDENT TO SPECIFIC PARTS OF PETITIONERS' APPLICATION

At pp. 16-19 of Respondent's Opposition (ECF No. 125), Respondent raised several *specific objections* to items included in Petitioners' application for fees and costs in this case.

### A.  *Knickelbein fees*

First, referring to an attorney in the firm of Petitioners' counsel of record, Respondent argued that "the majority of the work billed by Sabrina Knickelbein was for paralegal tasks billed at an attorney rate." (ECF No. 125, p. 17.)  The Reply filed by Petitioners' counsel did not address this issue. (See ECF No. 129, p. 4.)  In any event, most of Ms. Knickelbein's work occurred after August of 2011, and therefore will not be compensated at all, on "reasonable basis" grounds as discussed above.  (An exception concerns work that Ms. Knickelbein performed concerning the fees and costs application in 2016, which I will discuss below.)

---

[24]     The Vaccine Act special masters in recent years have been overwhelmed by vastly more cases than they had in prior years.  Thus, special master time spent on resolving frivolous claims, such as the claim in this case, inevitably means that Vaccine Act petitioners with meritorious cases must wait longer for their claims to be decided.

As to the small amount of work performed by Ms. Knickelbein in 2005, 2007, and early 2011, after a review of her billing records, I will award her claimed *attorney's rate* for those years.  However, as to hours billed by Ms. Knickelbein in 2016, relating to the attorneys' fee application and litigation, those hours, from their description in the billing records, appear to be, as Respondent argued, for paralegal-level tasks. (ECF No. 129-2, pp. 60-61.)  And as noted above, Petitioners' reply did *not* challenge Respondent's argument concerning this point. (*See* ECF No. 129, p. 4.)  Accordingly, I will compensate these hours at a *paralegal rate* of $140 per hour. (*See McCulloch v. HHS*, No. 09-293V, 2015 WL 5634323, at \*21 (Fed. Cl. Spec. Mstr. Sept. 1, 2015).)

## B.  Hours spent on <u>general causation</u> issues 2003-2010

Respondent next contends (ECF No. 125, p. 17) that Petitioners' counsel of record, Mr. Shoemaker, "inappropriately billed an excessive number of hours in this case leading up to and including the OAP proceedings for tasks that were geared towards the general causation question addressed within the OAP proceedings."  It is true that Mr. Shoemaker participated in the prosecution of the OAP test cases and was compensated for that work. (*See Cedillo v. HHS*, No. 98-816 (Fed. Cl. Spec. Mstr. Nov. 29, 2010) (on Court website); *King v. HHS*, No. 03-584V, 2009 WL 3320508 (Fed. Cl. Spec. Mstr. Sept. 28, 2009).  But none of the hours billed in this case seem to be the same hours billed in the OAP test cases.

Nevertheless, I find that Respondent is correct that during the years 2003 through March of 2010, Mr. Shoemaker spent a *great many* hours in working on the thimerosal *general causation theory*, which was eventually addressed at length in the second set of three OAP test cases that were issued on March 12, 2010.  A review of Mr. Shoemaker's billing sheets indicates that Mr. Shoemaker (using the initials "CJS") billed *many* hours for general causation matters in 2003, 2004, 2005, 2006, 2007, 2008, 2009, and in January through March 12 of 2010.  (ECF No. 129-2, pp. 1-20.)  Was it reasonable for Mr. Shoemaker to spend so many hours on the very general causation issue that was at the *same time* being developed and litigated in the second set of OAP test cases?  I conclude that it was not.

As the special master who had all of the approximately 5,000 autism cases on my docket in the early 2000s through early 2007, and then one-third of the autism cases thereafter, I am aware of the general practice of *most* attorneys who were counsel of record in autism cases from 2002 through March of 2010.  As was anticipated when the "test case" system of litigating these 5,000 cases was devised, the vast majority of such counsel billed *very few or no hours* during this period for developing "general causation" theories.  This made sense, since a small group of specific counsel had been selected by the Petitioners' Steering Committee to assemble the evidence concerning the general causation issue, and present any appropriate evidence during the test case evidentiary hearings.  It made sense that most of the other counsel with autism cases, who were *not* part of that select group, *simply waited* for the outcome of the test cases, to see whether the test case opinions found any validity in the vaccine-causation theories presented in the test cases.  As noted above, when the exhaustive test case opinions, and the appeals thereof, found *no validity* to the proffered vaccine-causation theories, *most* of the counsel with autism cases withdrew or otherwise disposed of their clients' claims relatively quickly thereafter, in effect accepting the outcome of the test cases.

Mr. Shoemaker, however, proceeded quite differently from most counsel with Vaccine Act autism cases.  As noted, during the period 2003 to 2010, while the test cases were being researched, prepared, and litigated by the attorneys selected by the Petitioners' Steering Committee, Mr. Shoemaker for some reason chose to spend approximately 76.4 hours doing his own work relating to the general causation theory that thimerosal can cause or aggravate autism.

I conclude that Mr. Shoemaker did *not* act reasonably in this regard.  As noted, Respondent has argued that it was not reasonable for Mr. Shoemaker to bill "an excessive number of hours in this case," in the time period leading up to the "second theory" test case decisions, "for tasks that were geared towards the [same] general causation question addressed within the OAP" test cases. (ECF No. 125, p. 17.)  And Mr. Shoemaker largely failed even to respond to this argument of Respondent.  He acknowledged that many of his hours billed in the case were for work that was "similar" to that done by other attorneys in the "test cases" -- *i.e.*, "developing theories of causation." (ECF No. 129, p. 2, line 5.)  But he *failed* to even attempt to explain why his work of this type was reasonable in this case. (*Id.*)

In reviewing counsel's billing records from 2003 to 2010, I found that many of the hours that were billed involved general causation matters, rather than the specific claims made in this case.  I therefore conclude that the hours during 2003-2010 that Mr. Shoemaker spent on "developing" the same theory that was presented in the second theory test cases were *not* reasonably spent, and this will not be compensated in this case.  I will disallow those hours, as specified below.  (In this regard, I will also disallow most of the hours counsel spent interacting with Drs. Geier and Megson.  Based on my discussion of Dr. Geier above, I find that **all** hours spent dealing with that disreputable individual are *per se* unreasonable.  As to Dr. Megson, it was reasonable for counsel to work with her concerning Petitioners' unpersuasive general causation theory, but only until the *same* general causation theory was considered and rejected in 2010, in the published decisions of all three special masters who presided over the autism test cases.)

Studying counsel's billing records (*see* ECF No. 129-2, pp. 1-20) , I find that the noncompensable hours in this regard include: **1.6 hours in 2003**, consisting of 0.5 on 5/12, 0.5 on 12/8, 0.6 on 12/10;  **24.1 hours in 2004**, consisting of 0.5 on 2/10, 10.0 on 3/3, 1.0 on 3/15, 0.8 on 3/16, 1.0 on 3/21, 0.5 on 3/26, 0.5 on 3/31, 0.4 on 4/1, 0.6 on 4/3, 0.4 on 4/15, 3.0 combined on 5/25, 0.5 on 6/16, 1.0 on 7/21, 0.5 on 8/12, 0.5 on 8/14, 0.3 on 8/19, 0.7 on 9/10, 0.5 on 10/26, 0.4 on 12/6, 1.0 on 12/14;  **18.0 hours in 2005**, consisting of 0.5 on 1/7, 0.5 on 1/9, 0.5 on 1/11, 0.5 on 1/12, 0.4 on 1/20, 1.0 on 2/15, 0.5 on 3/11, 0.4 on 3/19, 2.0 on 5/10, 0.5 on 5/11, 1.0 on 6/1, 1.0 on 6/10, 2.0 on 6/28, 0.4 on 7/11, 0.5 on 7/26, 1.0 on 8/8, 0.5 on 8/25, 0.5 on 8/28, 0.4 on 8/29, 0.5 on 9/13, 1.0 on 9/25, 0.4 on 10/29, 2.0 on 11/8;  **7.2 hours in 2006**, consisting of 1.0 on 2/15, 1.4 combined on 2/27, 1.0 on 3/15, 1.0 on 3/22, 0.3 on 7/26, 0.3 on 9/9, 1.0 on 11/5, 0.5 combined on 11/7, 0.7 on 11/11; **14.8 hours in 2007**, consisting of 0.1 on 1/3, 0.4 on 1/24, 0.4 on 1/28, 0.5 on 2/8, 0.3 on 2/16, 0.3 on 3/30, 0.1 on 4/8, 0.4 on 5/29, 0.3 on 5/31, 0.2 on 6/1, 0.3 on 6/30, 0.6 on 8/10, 0.3 on 11/5, 3.4 combined on 11/7, 2.5 on 11/8, 2.0 on 11/9, 1.0 on 11/10, 1.0 on 11/15, 0.7 on 12/16; **2.6 hours in 2008**, consisting of 0.7 on 3/8, 0.2 on 3/11, 0.5 on  4/5, 0.7 on 8/16, 0.5 on 12/7; **2.8 hours in 2009**; consisting of 0.5 on 1/21, 0.8 on

4/12, 1.5 on 8/21; **3.1 hours in early 2010**, consisting of 1.5 on 3/6, 1.6 on 3/7.[25]  These hours will be subtracted from the yearly subtotals of Mr. Shoemaker's billed hours, at the end of each year from 2003 through 2010.

### C.  Hourly rates

Respondent also objects to the *hourly rates* claimed by Petitioners' attorneys. (ECF No. 125, p. 18.)  I will grant the hourly rates claimed by attorneys Gentry, Shoemaker, and Knickelbein in the firm's billing entries for the years 2002 through 2011. (ECF No. 129-2, pp. 1-20.) (Shoemaker: 2002 -- $258; 2003 -- $268; 2004 -- $278; 2005 -- $288; 2006 -- $299; 2007 -- $310; 2008 -- $324.26; 2009 -- $336.58; 2010 -- $346; 2011 -- $358) (Gentry 2002 -- $242; 2003 -- $251; 2004 -- $260; 2006 -- $280; 2007 -- $290) (Knickelbein: 2005 -- $225; 2007 -- $261; 2011 -- $300).  For the hours billed in 2016 by both Mr. Shoemaker and Ms. Gentry pertaining to the fees application and litigation, I will pay Mr. Shoemaker and Ms. Gentry at the claimed rates of $430 and $415, respectively, for the hours that I find reasonable.  *See McCulloch v. HHS*, No. 09-293V, 2015 WL 5634323, at *18-19 (Fed. Cl. Spec. Mstr. Sept. 1, 2015); *Jaffri v. HHS*, No. 13-484V, 2016 WL 7319407, at *6 (Fed. Cl. Spec. Mstr. Sept. 30, 2016).

---

[25]     I note that in doing this calculation, I found many other billing entries that were questionable, but I have given Petitioners' counsel the "benefit of the doubt" concerning those additional time claims.

# VII

# COMPUTATIONS

*A.  Shoemaker fees 2001-2011*

(*See* ECF No. 129-2, pp. 1-20.)

- For 2001:  .33 hours billed x $250      =    $     82.50

- For 2002:  3.4 hours billed x $258      =    $   877.20

- For 2003:  7.4 hours billed less 1.6 hours
  deducted above as unreasonable = 5.8 hours x $268   =   $ 1,554.40

- For 2004:  42.1 hours billed less 24.1 hours
  deducted above as unreasonable = 18 hours x $278   =   $ 5,004.00

- For 2005:  32.4 hours billed less 18 hours
  deducted above as unreasonable = 14.4 hours x $288   =   $ 4,147.20

- For 2006:  14.5 hours billed less 7.2 hours
  deducted above as unreasonable = 7.3 hours x $299   =   $ 2,182.70

- For 2007:  34.15 hours billed less 14.8 hours
  deducted above as unreasonable = 19.35 hours x $310   =   $ 5,998.50

- For 2008:  9.3 hours billed less 2.6 hours
  deducted above as unreasonable = 6.7 hours x $324.26   =   $ 2,172.54

- For 2009:  7.1 hours billed less 2.8 hours
  deducted above as unreasonable = 4.3 hours x $336.58   =   $ 1,447.29

- For 2010:  14.6 hours billed less 3.1 hours
  deducted above as unreasonable = 11.5 hours x $346   =   $ 3,979.00

- For 2011 through 8-31-11:  10.2 hours billed x $358      =    <u>$ 3,651.60</u>

                Total Shoemaker Fees    =    $ 31,096.93

**B. Gentry fees 2002-2011**

(*See* ECF No. 129-2, pp. 46-47) (no reductions)

- For 2002:  6.15 hours billed x $242          =     $  1,488.30

- For 2003:  1.5 hours billed x $251          =     $    376.50

- For 2004:  2.0 hours billed x $260          =     $    520.00

- For 2006:  0.1 hours billed x $280          =     $      28.00

- For 2007:  1.5 hours billed x $290          =     $    435.00

                                   Total Gentry Fees     =     $  2,847.80

**C. Knickelbein fees 2005 - 2011**

(*See* ECF No. 129-2, pp. 47-49) (no reductions)

- For 2005:  0.6 hours billed x $225          =     $    135.00

- For 2007:  3.4 hours billed x $261          =     $    887.40

- For 2011:  1.5 hours billed x $300          =     $    450.00

                              Total Knickelbein Fees     =     $  1,472.40

**D. Fees for fees application and related briefing**

After carefully reviewing the billing records for the fees application and related briefing, I will compensate Ms. Knickelbein for 1.2 hours x $140[26] = $ 168.00 (*see* ECF No. 129-2, pp. 60-61).  I will compensate Ms. Gentry for 14.6 hours x $415 = $ 6,059.00 (*see* ECF No. 129-2, p. 47).  I will compensate Mr. Shoemaker for 6.0 hours x $430 = $2,580.00 (*see* ECF No. 129-2, p. 45).  (I conclude that the total attorney hours allowed for the fees application and related briefing is reasonable, and likely generous, for the work-product produced.)

**E. Costs of Petitioners' counsel**

I will allow all the costs claimed through 2011 with two exceptions: (1) the $3,675 claimed for "Mark Greenspan," which is not explained; and (2) the $18,660 claimed for Dr. Mark Geier -- I find that it was quite unreasonable, even in 2008, to contract with Dr. Geier, for reasons set forth above at Section IV(C)(3)(a)(i) of this Decision, and in *King v. HHS*, No. 03-584V, 2010 WL 5470787, at *5-17 (Fed. Cl. Spec. Mstr. Dec. 13, 2010).  Costs incurred after August 2011 will not be allowed, on "reasonable basis" grounds, as explained above.

---

[26]      See the discussion of Ms. Knickelbein's hourly rate at Section VI(A).

The costs allowed at ECF No. 129-2, p. 61 equal $ 768.35.

### F. Petitioners' own costs

Petitioners have applied for reimbursement of $2,896.05 for costs that they incurred themselves. (ECF No. 117, p. 3.)  I will allow those costs as claimed.

### G. Summary

| | |
|---|---|
| Shoemaker fees 2002-2011: | $ 31,096.93 |
| Gentry fees 2002-2011: | $ 2,847.80 |
| Knickelbein fees 2005-2011: | $ 1,472.40 |
| Fees for Fees Application: | $ 8,807.00 |
| Counsel's costs: | $ 768.35 |
| Attorneys' fees and cost subtotal | $ 44,992.48 |
| Petitioners' costs: | $ 2,896.05 |
| Total award = | $ 47,888.53 |

## VII

## NOTATION CONCERNING "REASONABLE BASIS" IN AUTISM CASES IN GENERAL

As discussed above in Section II of this Decision, in the early 2000s controversies arose concerning whether autism spectrum disorders might be caused or affected by vaccines.  Thus, thousands of Vaccine Act claims were filed during those years alleging that ASDs were vaccine-caused.  These claims were certainly brought in good faith.  Further, in light of the scientific uncertainty at the time, I find that the *filing* of those petitions was reasonable.  It was also reasonable to keep such claims pending until the OAP "test cases" became final in 2010, and for some short period of time thereafter, in order for counsel for each petitioner to digest the complicated science, and to consult with experts to see if a reasonable basis to go forward could be found.

However, by the end of 2010, the two major theories concerning vaccine-causation of autism had been thoroughly considered and rejected in the OAP test cases, with opinions that, among other things, found that *all* of the many reputable epidemiological studies had found *no association* between any vaccines and autism.  At that point, the vast majority of the approximately 5,000 autism petitioners each elected either to withdraw their claim, or to request that the special master enter a decision denying their claim on the written record.  Only a small minority of the autism petitioners elected to continue to pursue their cases, seeking other

causation theories and/or other expert witnesses.  Since 2010, a number of such cases have gone to trial before special masters, and in the cases of this type decided thus far, *all* have resulted in *rejection* of petitioners' claims that vaccines played a role in causing or aggravating their child's autism or autistic symptoms.  *See* the cases cited above in Section II.

There is now, therefore, a serious question concerning whether it is reasonable for additional Vaccine Act petitioners to continue to pursue highly speculative theories concerning vaccinees with autism spectrum disorders.  In each such case, of course, a case-specific decision must be made concerning if and when it became unreasonable, under all the circumstances of the case, to continue to go forward.  In many of the cases decided since 2010, petitioners have tried to avoid the conclusions of the test cases by alleging that a child suffered a vaccine-caused "encephalopathy" that resulted in "autistic-like features," or that a child had an underlying "mitochondrial disorder" that somehow made the child more vulnerable to injuries by vaccines, or that an "autoimmune" process was involved.  But all such cases, in essence, have amounted to attempts to prove that vaccines can cause or aggravate *symptoms of ASDs*.  And, except for the two highly unusual Table Injury cases described at footnote 5 above, all such theories have been *rejected*.

Further, a review of the post-test case decisions enumerated in Section II above demonstrates that those cases typically involved expert witnesses who were quite underqualified to opine on the vaccine-causation issues at hand, and/or presented theories with no substantial scientific merit, and/or disregarded the facts contained in the medical records of the case.

Accordingly, I hereby put counsel, especially in autism-related cases, on notice, once again, that if counsel continue to go forward with such extremely weak cases, I am *not* likely to find that there was a reasonable basis for their continued prosecution of the case.  (*See also Wilson v. HHS*, No. 15-551V, 2017 WL 877278, fn. 14 (Fed. Cl. Spec. Mstr. Feb. 10, 2017), quoted at p. 10 above.)

## VIII

## CONCLUSION

For the foregoing reasons, I hereby award the following attorneys' fees and costs pursuant to 42 U.S.C. § 300aa-15(e)(1):

- a lump sum of $44,992.48, in the form of a check payable jointly to Petitioners and Petitioners' counsel, Clifford Shoemaker, for services performed by counsel's law firm.

- a lump sum of $2,896.05, in the form of a check payable to Petitioners, which represents Petitioners' own litigation expenses in this case.

    In the absence of a timely-filed motion for review filed pursuant to Appendix B of the Rules of the U.S. Court of Federal Claims, the clerk of the court shall enter judgment in accordance herewith.[27]

**IT IS SO ORDERED.**

/s/ George L. Hastings, Jr.
George L. Hastings, Jr.
Special Master

---

[27]     Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by filing notices renouncing the right to seek review.